[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 11, 2011
JOHN LEY
CLERK

No. 09-13929

_____

D. C. Docket No. 08-00153-CR-TWT-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

EDGAR JAMAL GAMORY,
a.k.a. J.B.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(March 11, 2011)

Before BARKETT, MARTIN and HILL, Circuit Judges.

MARTIN, Circuit Judge:

Appellant Edgar Jamal Gamory appeals his convictions for conspiracy to

possess with intent to distribute at least five kilograms of cocaine and at least

1,000 kilograms of marijuana and money laundering. Gamory also appeals his

sentence of life imprisonment and raises eleven different issues challenging either his convictions or sentence. After thorough review, and having had the benefit of oral argument, we affirm.

## I. FACTUAL BACKGROUND

In June 2008, a Northern District of Georgia federal grand jury named Gamory in a five count superseding indictment. Gamory, along with three co-defendants,[1] was charged in count one with conspiring to distribute and possess with the intent to distribute cocaine and marijuana in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(A)(ii) and (vii). Gamory was also charged in counts two, three, four, and five with aiding and abetting in four separate money laundering transactions in violation of 18 U.S.C. §§ 1957 and 2. The government filed a notice for increased punishment pursuant to 21 U.S.C. § 851.

### A. INVESTIGATION AND OFFENSE CONDUCT

In July of 2006, Special Agent Larsen of the Atlanta Field Office of the Drug Enforcement Agency ("DEA"), began an investigation of codefendant Victor Olvera following a traffic stop and seizure of more than $800,000 in United States currency. During a subsequent search of Olvera's discarded trash bags, agents

---

[1] Gamory's indicted co-defendants were Edmond Gamory, a/k/a "Punch" or "Pudge," Vaughn Greene, a/k/a "Smooth," and Victor Olvera.

discovered evidence of drug trafficking, including drug ledgers. During the course of the investigation, Agent Larsen identified other subjects, initially known only by their nicknames as JB, Smooth, and Pudge. Eventually, agents secured the cooperation of a confidential informant ("CI" or "CS"), who provided information on a Mexican drug trafficker, Enrique Juangorena, who the CI said had been providing cocaine and marijuana to JB, later identified as Edgar Gamory.[2]

According to trial testimony, in late or early 2005, Juangorena began supplying cocaine to Gamory, who operated in Georgia, North and South Carolina, Virginia, and New York. Juangorena first met Gamory at Gamory's residence, where Juangorena and the CI went to pick up $750,000 or $800,000 in drug proceeds from the sale of cocaine.

In addition to translating conversations between Gamory and Juangorena, the CI delivered cocaine from Juangorena to Gamory and in turn counted and transported drug proceeds from Gamory's residence. The CI testified that Gamory received more than 2,000 kilograms of cocaine. Also during this period, the CI

---

[2] In addition to identifying Gamory, who the CI knew as "JB," the CI identified Gamory's brother Edmond, or "Punch," who purchased marijuana from Juangorena. The CI also identified Gamory's residence, Gamory's recording studio for Hush Money Entertainment, and a warehouse that the Gamorys used to receive cocaine and marijuana.

picked up drug proceeds in amounts of $300,000, $600,000, and $800,000 generated from the sale of cocaine.

Gamory employed childhood friends, including Errol Moliere and Durrell Holland (both of whom testified against him at trial), to sell drugs and collect drug proceeds for him. Moliere sold cocaine for Gamory in Raleigh and Greensboro, North Carolina, and Alexandria, Virginia, between 1998 and 2006. Similarly, Holland sold cocaine for Gamory in Greensboro; Charleston, South Carolina; and Norfolk, Hampton, Newport News and Virginia Beach, Virginia between 2000 and 2007. Between 2005 and 2007, Holland sold between 18 to 20 kilograms of cocaine every four to five days while in Virginia. Holland received the cocaine from couriers who worked for Gamory and drove a Ford Explorer belonging to Gamory, which had a secret compartment in it to transport drugs and drug proceeds between Atlanta and Virginia.

In January 2006, Moliere moved to Atlanta and lived in Gamory's basement for two or three months while working with Gamory in the music recording business at Gamory's studio, Hush Money Entertainment ("HME"). According to Moliere and Holland, HME was a hobby that never got off the ground, and Gamory never made any money from it. Gamory also owned seafood restaurants in New York, but was not the registered owner. Rather, the restaurants were

4

registered in the name of Steve Workman, another childhood friend who worked with Gamory in the drug business. According to Holland, Workman just "legalized" the fish restaurants for Gamory.

In May 2007, as directed by agents, the CI contacted Gamory and made arrangements for Gamory, Juangorena, and the CI to meet at HME on May 24, 2007, for a controlled drug buy. In anticipation of the meeting, surveillance was set up at Gamory's residence and recording studio that day. DEA agents observed two people leave the residence in different cars, including a green Ford Explorer, which agents suspected had a hidden compartment based upon information received from the CI. Agents followed the Explorer to a location where it was parked in a garage at Providence Apartments in Lithonia, Georgia ("the apartment" and "apartment garage," respectively). Vaughn Greene was identified as the driver of the Explorer at the scene. Agents also identified another cooperator, Errol Moliere,[3] who was observed meeting with Greene at the apartment complex after Greene had parked the Explorer in the apartment garage.

---

[3] Moliere, a/k/a "E," was subsequently prosecuted in Virginia, cooperated with the government, and testified against Gamory at his trial.

Agents obtained consent[4] to search the apartment garage from Greene's girlfriend, Lakisha Parker. During a search of the Explorer, agents seized $630,000 from a hidden compartment. Moliere later identified the Explorer that Greene was driving that day as belonging to Gamory and having been used in the past to deliver cocaine to, and pick up drug proceeds from, Moliere in Virginia or North Carolina. At trial, Holland and Moliere both identified some of the bundles of money, which were labeled with the letter "D," as drug proceeds Holland had collected and Moliere and Greene packaged at Holland's residence in Virginia for Gamory.

Agent Larsen then obtained a search warrant for Gamory's residence at Riverwalk Trail, in Lilburn, Georgia ("Gamory's residence"), which was executed the next day, on May 25, 2007. During the search, agents seized a large amount of cash, jewelry, five firearms, a Kevlar police vest, drug packaging materials, and papers which contained notations similar to those found in drug ledgers. Agents also located a hidden compartment which had been built into the basement stairs by the CI and Olvera.

### B. MOTION TO SUPPRESS

---

[4] Gamory disputes that Parker gave her consent, which became the focus of his motion to suppress. We address this issue at pages 8, 17–18.

Following his indictment, Gamory pled not guilty and filed a motion to suppress evidence that had been seized from his residence. Codefendant Greene[5] also filed a motion to suppress evidence seized at Gamory's residence on May 25, 2007, as well as evidence which had been seized at the apartment and apartment garage in Lithonia. Gamory and Greene both filed motions for evidentiary hearings on their motions to suppress. In his suppression motion, Gamory alleged the warrant affidavit included materially false information regarding Lakeisha Parker's having given consent to search her apartment garage, thus violating Franks v. Delaware, 438 U.S. 154, 98 S. Ct. 2674 (1978).[6]

The Magistrate Judge granted Greene an evidentiary hearing but not Gamory. After hearing Parker's testimony that she did not consent and the government's agents' testimony to the contrary, the Magistrate Judge concluded that Parker's testimony was "simply not credible" and thus recommended denying Gamory's motion to suppress and request for a Franks hearing. Over Gamory's

[5] The District Court's handling of Greene's separate motion to suppress is relevant to understanding Gamory's first issue on appeal, in which he argues the District Court erred by failing to give him an evidentiary hearing on his motion to suppress evidence seized from his residence.

[6] Gamory attached an affidavit from Parker to support his motion to suppress. In Parker's affidavit, she swore that she never gave consent to search her apartment or garage and that law enforcement broke into her garage and searched it without her permission.

objections, the District Court approved and adopted the Magistrate Judge's recommendation and denied his motions to suppress.

## C. TRIAL

Gamory proceeded to a jury trial. Voir dire was conducted by the District Court and by the parties. The government struck jurors 13, 18, 25, 27, 29, and alternate juror 20. Gamory challenged four of the government's six peremptory strikes based on "statistics more than anything else," i.e., jurors 13, 25, 27, and 29. Gamory argued that the government's use of four of its six peremptory challenges, or 66%, to strike African-American jurors violated Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712 (1986). The District Court rejected this challenge, however, after concluding that the government offered race neutral explanations.

During the trial, the government presented the testimony of 19 witnesses, including: Agent Larson; the CI; Holland; Moliere; Juangorena; various surveillance agents who testified to the facts set out above; various car dealers regarding automobile purchases and state and federal tax officials regarding income tax records. With the exception of HME and Gamory Enterprises, the evidence showed that all of Gamory's assets, including his residence, vehicles and restaurants, were titled in alias names used by Gamory or in the names of other people, primarily Gamory's family members.

Additionally, over Gamory's objections, the government introduced evidence that Gamory had paid no personal income or business taxes for HME and Gamory Enterprises during the years 2003-2006, and neither had he paid taxes for his restaurants during 2003-2007.[7] Gamory objected on the grounds that the records were irrelevant and unfairly prejudicial, under Fed. R. Evid. 403. There were also a number of witnesses who testified regarding the drug conspiracy and money.[8]

To prove the money laundering charges, the government relied on the testimony of the CI, Juangorena, Holland and Moliere and the existence (or lack thereof) of tax records for Gamory and his family to show that Gamory did not have a legitimate source of income. Based on this evidence, as well as testimony by Wardell Strickland about how the purchases were conducted, the government

---

[7] The government introduced tax returns, or a notice of no return filed, for Gamory's wife, Gamory's mother, and Gamory's father, during the years 2003-2006; and Gamory's stepmother during the years 2005-2006.

[8] For example, Durrell Holland testified that he himself was a part of the conspiracy, selling cocaine for JB, whom he identified as Gamory. He stated that he gave the money for the cocaine he bought to Gamory. He noted that he sold as much as 18-20 kilograms of cocaine every four to five days at the peak of the drug ring. Enrique Juangorena testified that he had worked in the drug ring, bringing cocaine from Texas to Atlanta. He met Gamory, who he knew as "JB," through the CI. Although he mostly dealt with the CI rather than Gamory directly, Juangorena did go to Gamory's house to pick up around $750,000 or $800,000 in drug money. He supplied cocaine from 2004 to 2006, in shipments as large as 400 kilograms. They also transported several loads of marijuana, totaling 1,500, 2,000, and 2,500 pounds each.

9

argued that the vehicles that Gamory bought for himself and his family were purchased with drug proceeds.

Over Gamory's objection, the government played a rap music video produced by HME in August 2006 that was discovered on the "YouTube" website during the trial. Gamory objected based on Fed. R. Evid. 403, arguing that the content of the video was unfairly prejudicial and of slight probative value since Gamory did not appear in the video and had not written the lyrics.[9] The video shows the rap artist Tone Flowa singing a rap song that contained explicit lyrics dealing with drugs, sex, profanity, degradation of women, firearms, and threats of violence against the police and public.

The District Court overruled Gamory's objection and the rap video was played to the jury. Gamory did not request any redaction or cautionary instructions, and the Court did not provide any on its own initiative. Agent Larsen

_____

[9] In the District Court, the government argued the video was admissible evidence relevant to rebut Gamory's defense that he was a legitimate businessman, because it showed his businesses were a cover for the drug ring. Further, the government argued that the lyrics reference to "drug money is Hush Money, drug money is Hush Money which is said repeatedly throughout that video is very relevant to [the charges] that Mr. Gamory is a drug dealer." The government also argued that the lryics referencing "hush money," "drug money," and "an off-white crib with a Rover parked out front," as well as jeweled cufflinks worn by the artist in the video, were relevant because Gamory's recording business was named "Hush Money Entertainment," was located in an off-white house, and Gamory drove a Range Rover. Finally, the government argued that Gamory owned a pair of jeweled "JB" cufflinks which matched a necklace featuring the jeweled letters "JB" on it that were displayed during the video.

testified that the purpose of showing the video was to demonstrate a correlation between JB, Hush Money, and drug money, but she acknowledged that Gamory was not in the video.

At the close of the government's case, Gamory moved for a judgment of acquittal, which was denied by the District Court after argument.

Although Gamory did not testify himself, he presented the testimony of six witnesses, recalling two government witnesses and presenting four defense witnesses. During both the government's case-in-chief and through his own witnesses, Gamory portrayed himself as a legitimate businessman in the entertainment and restaurant businesses.[10]

---

[10] Keith Branch testified that Gamory owned two fish-and-chips restaurants in Brooklyn, New York, and that these enterprises did good business. Rodney Brown testified that he was a manager at one of Gamory's Brooklyn fish-and-chip restaurants in Brooklyn for five years, which he described as a very successful cash business. In 2007, Brown said he gave Gamory $200,000 in cash from one restaurant alone.

In addition, Gamory presented the testimony of Melissa Phillipian, a music executive from Los Angeles, California who testified that the music business is a largely cash business. Further, Phillipian stated that people involved in the music industry could be successful without national recognition and that people in the industry often spend great amounts of money on jewelry and cars to promote a successful image. Finally, Gamory called Shomari Greene, a recording artist who operated Gamory's Hush Money recording studio. Shomari Greene stated that since 2006, the studio had produced five albums and sold more than 200,000 to 250,000 units, in addition to clothing and apparel. He also stated that the rap video played to the jury was not about drugs.

Following closing arguments and jury instructions, the jury returned a guilty verdict as to counts one, two, and three, and a not guilty verdict as to counts four and five.

## D. THE MOTION FOR NEW TRIAL

Gamory filed a timely motion for new trial based on fourteen different grounds.[11] The District Court denied the motion for new trial and reaffirmed that it had carefully reviewed the Magistrate's R&R's denying the motion to suppress; that Gamory had not made out a sufficient showing to warrant a <u>Franks</u> hearing; and that, "even disregarding the statements from the confidential source there was sufficient probable cause to support the search." Further, the District Court stated that the CI's trial testimony was consistent with the probable cause affidavit and "very credible," which reinforced its belief of the correctness of its prior ruling regarding the motion to suppress.

## E. THE SENTENCING HEARING

Gamory objected to being held accountable under United States Sentencing Guidelines § 2D1.1 (Nov. 2008) for a quantity of approximately 815 kilograms of

---

[11] Gamory argued, <u>inter alia</u>, that he was entitled to a <u>Franks</u> hearing because the CI's testimony at trial was inconsistent with the information attributed to the CI in the search warrant affidavit for Gamory's residence. Gamory also argued that he was unfairly prejudiced by the admission of the YouTube rap video produced by HME.

cocaine. In support, Gamory argued that the 815 kilogram finding violated

Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000), given that the jury

verdict form specified only that Gamory's offense involved five or more kilograms

of cocaine. The District Court overruled Gamory's objection, finding that the CI

and Juangorena provided credible testimony that Gamory was a "large-scale dealer

in cocaine and marijuana," who was involved with more than 150 kilograms of

cocaine. The District Court then sentenced Gamory to life imprisonment on count

one and 10 years on counts two and three, to run concurrently with count one.

## II. DISCUSSION

On appeal, Gamory raises eleven issues which he argues compel a new trial

or reduced sentence. We conclude that six of these issues are without merit and

therefore do not address them.[12] We address his remaining five claims in turn.

### A. GAMORY'S MOTION TO SUPPRESS

---

[12] Gamory argues that: (1) the District Court's imposition of a life sentence violated Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000) because the jury's finding on drug quantity only provides support for a statutory minimum-mandatory sentence of 10 years pursuant to 21 U.S.C. § 841(b)(1)(A)(ii) and (iii); (2) the District Court abused its discretion by admitting his tax records, as well as those of his family; (3) 21 U.S.C. § 846 – the drug conspiracy statute – violates the Commerce Clause; (4) the District Court constructively amended his indictment by broadening the basis for a conviction in its instructions to the jury; (5) the District Court erred by using a special verdict sheet regarding drug quantity; and (6), the District Court erred by denying his motion for new trial pursuant to Fed. R. Crim. P. 33. After careful review and oral argument, we conclude that these arguments, and any other arguments not addressed in further detail in this opinion, either lack merit or are foreclosed by circuit precedent and warrant no further discussion.

Gamory argues that the District Court abused its discretion by failing to grant him an evidentiary hearing on his motion to suppress. In particular, Gamory contends: (1) his co-defendant Greene was afforded a full hearing on his motion to suppress, while he was not; (2) there were material issues of fact regarding probable cause that were deliberately falsified by law enforcement contrary to Franks v. Delaware, 438 U.S. 154, 98 S. Ct. 2674 (1978); and (3) there were disputed issues of fact regarding the existence of the CI's reliability, veracity and basis of knowledge, contrary to Illinois v. Gates, 462 U.S. 213, 103 S. Ct. 2317 (1983). Further, Gamory asserts that the denial of his motion to suppress without an evidentiary hearing violated his right to due process, right to confrontation, and right to counsel.

The gravamen of Gamory's Franks, due process, confrontation, and right to counsel arguments stem from the fact that the Magistrate Judge granted codefendant Greene an evidentiary hearing but not Gamory, then denied both Greene's and Gamory's motion to suppress in a single combined R&R based upon findings derived from Greene's evidentiary hearing.

Generally, a District Court's "decision about whether to hold an evidentiary hearing lies within the court's sound discretion and will be reviewed only for an abuse of discretion." United States v. Arbolaez, 450 F.3d 1283, 1293 (11th Cir.

14

2006).[13] We must begin with the understanding that affidavits supporting arrests warrants are presumptively valid. Franks, 438 U.S. at 171, 98 S. Ct. at 2684. A defendant may challenge the validity of the government's affidavit by making a substantial preliminary showing that a false statement was included in the warrant affidavit knowingly and intentionally or with reckless disregard for the truth. Id. If a challenged statement was necessary to support probable cause for the search, the District Court must hold an evidentiary hearing. Id. at 171-72, 98 S. Ct. at 2684. If, however, probable cause still exists once the false statement is removed from the warrant, there is no need to hold a Franks hearing. Id.; see also Kapordelis, 569 F.3d at 1309 ("[E]ven intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause.") (quotation marks omitted). The defendant bears the burden of showing that, "absent those misrepresentations or omissions, probable cause would have been lacking." United States v. Novaton, 271 F.3d 968, 987 (11th Cir. 2001).

---

[13] We have not stated a precise standard of review for a District Court's denial of a Franks hearing, United States v. Kapordelis, 569 F.3d 1291, 1308 (11th Cir. 2009), and other circuits are split on the issue. See Arbolaez, 450 F.3d 1283, 1293 n.11 (11th Cir. 2006) (summarizing cases). As the more exacting de novo standard of review is satisfied in this case, we need not determine which standard of review applies. See Kapordelis, 526 F.3d at 1308–09.

Whether there was probable cause to support a search warrant is a question reviewed <u>de novo</u>, but we must "take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." <u>United States v. Jiminez</u>, 224 F.3d 1243, 1248 (11th Cir. 2000) (quoting <u>Ornelas v. United States</u>, 517 U.S. 690, 699, 116 S. Ct. 1657, 1633 (1996)).

In this case, after hearing Parker's testimony that she did not consent and the agents' testimony to the contrary, the Magistrate Court found that Parker's "version of events is not credible because it is inconsistent with the credible testimony of the other witnesses." After reviewing the law governing <u>Franks</u> hearings, the Magistrate Court concluded:

> Gamory has not met the strict standard for obtaining a <u>Franks</u> hearing. The only falsity or omission alleged by Gamory concerns whether Parker consented to the search of the garage. However, Gamory has not made a substantial preliminary showing that Agent Larsen knowingly and intentionally made a false statement in the affidavit. Agent Larsen was not on the scene at the garage, but remained at her office so that she could apply for a search warrant if agents developed probable cause. Hence, she relied on information relayed to her from agents at the scene. There is no evidence that Agent Larsen was told Parker did not consent to the search but then falsely stated in the affidavit she had consented. While Parker claims that she did not consent to the search of the garage, the agents at the scene believed she had consented and relayed that information to Agent Larsen, who included it in her affidavit.

16

Here, it is obvious that the Magistrate Judge made findings of fact regarding Parker's credibility, during Greene's hearing, which were relied upon to deny Gamory a Franks hearing and, ultimately, his motion to suppress. We do find it troubling that Gamory's request for a Franks hearing was denied based upon facts developed at a proceeding in which Gamory did not have any opportunity to participate. But even assuming the affidavit contained false or misleading statements, i.e., that Parker did not consent, we conclude that Gamory was not entitled to a Franks hearing. As the R&Rs stated:

> [E]ven if the Court accepted Parker's statement that she did not consent to the search and set aside the alleged false statement in the affidavit that she did consent, Gamory would still not be entitled to a Franks hearing because, when that statement is set aside, there remains sufficient content in the warrant affidavit to support a finding of probable cause.

We agree with this reasoning. In support of its alternative probable cause determination, the Magistrate Judge pointed to the historical information provided by the CI concerning Gamory's drug trafficking activities; the failed meeting between the CI and Gamory in May 2007; the drug ledger which contained entries for "JB;" the agents' observation of the Explorer at Gamory's residence a few days before agents seized approximately $500,000 in cash from it; and the presence of a hydraulic trap in the same Explorer. On these facts, probable cause existed to support the search warrant because the "totality of the circumstances allows the

17

conclusion that 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" Kapordelis, 569 at 1310 (quoting Illinois v. Gates, 462 U.S. 238, 103 S. Ct. 2332). The affidavit supplied the "authorizing magistrate with a reasonable basis for concluding that [Gamory] might keep evidence of his crimes at his home." Id.

We also reject Gamory's argument that the affidavit did not provide sufficient facts regarding the source of the information establishing probable cause because it did not include evidence about the CI or provide any independent police corroboration. Here, the CI possessed personal knowledge that Gamory was involved in cocaine and marijuana trafficking, under the initials "JB," and that Gamory transported drugs and money in a Ford Explorer. Further, the government agents corroborated this information when they noticed entries for "JB" in the drug ledger and saw a Ford Explorer at Gamory's residence. All told, these facts corroborated the CI's statements and supported a finding of probable cause that evidence of contraband would be found at Gamory's residence.

Thus, even discounting the purported tainted statements, there was still probable cause to support the search for the reasons stated above. As such, no Franks hearing was required. Franks, 438 U.S. at 171–72, 98 S. Ct. at 2684–85.

Since Gamory was not entitled to a <u>Franks</u> hearing, there was no violation of his rights to due process, confrontation, or right to counsel.

## B.  THE RAP VIDEO

Gamory challenges the District Court's admission, over his objection, of the rap video that was described above.  He contends the District Court abused its discretion by admitting the video because it was irrelevant, inadmissible hearsay, contrary to the Confrontation Clause, and unfairly prejudicial.  In the District Court, Gamory only objected based on Fed. R. Evid. 403 "with regards to prejudicial information that's contained on this video."  Because he did not preserve his relevancy, hearsay, and Confrontation Clause claims, they are subject to plain error review. <u>See</u>  <u>Arbolaez</u>, 450 F.3d at 1291 (holding that hearsay objection does not preserve a Confrontation Clause challenge); <u>United States v. Baker</u>, 432 F.3d 1189, 1206–07 n.12 (11th Cir. 2005).

With regard to preserved challenges to the admissibility of evidence, "we review [the District Court's rulings] for clear abuse of discretion." <u>United States v. Gary</u>, 572 F.3d 1352, 1361 (11th Cir. 2009) (quotation marks omitted).  "An abuse of discretion arises when the [D]istrict [C]ourt's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact.  <u>Baker</u>, 432 F.3d at 1202.

Where a District Court abuses its discretion in admitting evidence, we may still find the error harmless. United States v. Khanani, 502 F.3d 1281, 1293 (11th Cir. 2007). Non-constitutional error is harmless when it does not affect the substantial rights of the parties. See 28 U.S.C. § 2111; United States v. Guzman, 167 F.3d 1350, 1353 (11th Cir. 1999). Under this standard, to find non-constitutional error harmless, we must be able to say with "fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." Kotteakos v. United States, 328 U.S. 750, 765, 66 S. Ct. 1239, 1248 (1946). The burden is on the government to show that the error did not affect the defendant's substantial rights. United States v. Gallegos-Aguero 409 F.3d 1274, 1277 (11th Cir. 2005); United States v. Sweat, 555 F.3d 1364, 1367 (11th Cir. 2009). Conversely, for unpreserved claims, we apply plain error review and the challenging party must demonstrate that the error affected his substantial rights, in effect placing the burden on the defendant to show that the error was not harmless. See United States v. Jiminez, 564 F.3d 1280, 1286 (11th Cir. 2009).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. All relevant

20

evidence is admissible, except as otherwise provided for by the Constitution, Congress, or other rules. Fed. R. Evid. at 402. Relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

Based upon our independent review of the rap video and the totality of the record, we conclude that it was error under Fed. R. Evid. 403 to play this rap video to the jury. We recognize that the video could be construed to discuss Gamory inasmuch as the lyrics referred to JB, a white crib, a Range Rover, drugs and Hush Money and because the artist in the video, Tone Flowa, wore a necklace with a "JB" insignia that was similar to cuff links seized during the search of Gamory's residence. But the substance of the rap video was heavily prejudicial. The lyrics presented a substantial danger of unfair prejudice because they contained violence, profanity, sex, promiscuity, and misogyny and could reasonably be understood as promoting a violent and unlawful lifestyle. At the same time, the video was not clearly probative of Gamory's guilt. We cannot ignore the simple fact that Gamory was not in the video. Neither was there any evidence that Gamory

21

authored the lyrics or that the views and values reflected in the video were, in fact, adopted or shared by Gamory.

We are also mindful of the fact that the government introduced the rap video at the end of its case after it had already presented significant evidence that Gamory was JB and he owned Hush Money Entertainment. These facts were not seriously contested at the time the video was introduced and such evidence was therefore cumulative. In short, the probative value of the rap video was minimal at best, and more importantly was substantially outweighed by the video's unfair prejudice.

Further, there is little doubt that the rap video was inadmissible hearsay. The rap video contained a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Subject to certain exceptions not applicable to Gamory's case, the hearsay statements were inadmissible. See Fed. R. Evid. 802–804. In this Court, the government disavowed that the purpose of the video was to prove the truth of the matter asserted, but the District Court record contradicts that assertion. The prosecutor at trial stated as follows:

> I believe that the reference of drug money is Hush Money, drug money is Hush Money which is said repeatedly throughout that video

is very relevant to the issues for which are being tried here today, that being that the Government contends that Mr. Gamory is a drug dealer.

Further, the District Court's comments suggest it too considered the video relevant based upon the truth of the matters asserted in the lyrics.[14]

For these reasons, we affirmatively find that the introduction of the rap video was error and plain under Fed. R. Evid. 801(c) and 802, as well as preserved error under Rule 403.[15]  This requires us to next consider whether the error must have affected the outcome of Gamory's trial.  The plain error prejudice inquiry is

---

[14] After the District Court reviewed the video outside the presence of the jury, it overruled Gamory's prejudice objection, simply stating:

> I think there's sufficient relevance in the video associating the Hush Money Entertainment operation with drug money and with the Defendant to outweigh any potential prejudice that the video might otherwise cause.

[15] As noted above, Gamory's hearsay and Confrontation Clause objections are subject to plain error review.  Under plain error review, we may not correct an error not raised at trial unless there is "(1) error, (2) that is plain, and (3) that affects substantial rights." Arbolaez, 450 F.3d at 1291.  "If a legal rule was violated . . . there has been an 'error.'" United States v. Olano, 507 U.S. 725, 733–34, 113 S. Ct. 1770, 1777 (1993).  "'Plain' is synonymous with 'clear' or, equivalently, 'obvious.'" Id. at 734, 113 S. Ct. at 1777.  In order for an error to "affect substantial rights," "the error must have been prejudicial: It must have affected the outcome of the [D]istrict [C]ourt proceedings." Id. at 734, 113 S. Ct. at 1777–78.

Because we find the video was not testimonial in nature, there is no Confrontation Clause error under any standard.  Apart from the rules of evidence, out-of-court statements by witnesses that are "testimonial" are barred, under the Confrontation Clause, unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. See Crawford v. Washington, 541 U.S. 36, 68, 124 S. Ct. 1354, 1374 (2004).  We conclude that the rap video would not qualify under Crawford's definition of "testimonial." Id. at 51-52, 124 S. Ct. at 1364; see also, Davis v. Washington, 547 U.S. 813, 126 S. Ct. 2266 (2006) (explicating term "testimonial"); Michigan v. Bryant, —U.S.—, 2011 WL 676964 (2011) (same).

similar to the harmless error analysis we must use to evaluate Gamory's preserved, non-constitutional error under Rule 403, with one important distinction. The government bears the burden of persuasion on preserved claims, whereas Gamory bears the burden under plain error review. Olano, 507 U.S. at 734, 113 S. Ct. at 1778. As a result, if the government proves the preserved error was harmless, Gamory's unpreserved hearsay challenge fails.

We conclude that the errors relating to the admission of the rap video were harmless. As noted above, the record included first-hand testimony about Gamory's drug trafficking from several of his co-conspirators, which was corroborated by surveillance and seizures of substantial amounts of cash and drug ledgers. For example, the CI and Juangorena described cocaine transactions that put large amounts of cocaine directly in Gamory's hands. Moliere and Holland dealt directly with Gamory to sell this cocaine on Gamory's behalf in North Carolina and Virginia. Holland also described a green Explorer with a secret compartment that was associated with Gamory during surveillance in 2007.

The testimony at trial established that the CI arranged a meeting to discuss a 35-kilogram cocaine deal that, although unsuccessful, confirmed Gamory's drug dealing relationship with the CI and led to the seizure of $830,000 in cash from the Explorer that codefendant Greene drove from Gamory's residence. Finally,

24

during the search of Gamory's residence, agents seized large amounts of cash, jewelry, five guns, drug packaging materials, and drug ledgers. In light of this overwhelming evidence and our independent review of the entire record, we are able to conclude with "fair assurance . . . that the judgment was not substantially swayed by the error." Kotteakos, 328 U.S. at 765, 66 S. Ct. at 1248; see also United States v. Phaknikone, 605 F.3d 1099, 1109–10 (11th Cir. 2010) (finding erroneous admission of evidence from defendant's internet website, in which he allegedly portrayed himself as a gangster, was harmless in light of the overwhelming evidence of his guilt); United States v. Puentes, 50 F.3d 1567, 1578 (11th Cir. 1995) (finding District Court's error in admitting evidence was harmless in light of overwhelming evidence of defendant's participation in drug conspiracy).

## C. BATSON CLAIM

Gamory challenges the Government's use of peremptory challenges to strike four[16] African-American jurors and the District Court's conclusion that the

---

[16] As noted above, Gamory made a Batson challenge to four of the government's six peremptory strikes. On appeal, he claims that the government used all of its "six" peremptory strikes against African-Americans. The record does not reflect the race of jurors 18 and 20 which Gamory now claims were stricken in violation of Batson. To the extent there is an issue with respect to the race of jurors 18 and 20, Gamory failed to make a sufficient record in the District Court to allow us to review this claim. See United States v. Sangineto-Miranda, 859 F.2d 1501, 1520 (6th Cir. 1988) (holding a party alleging discrimination in the use of peremptory challenges must make a record supporting such allegation). Further, the government maintains

Government successfully provided race neutral explanations for the strikes.

The use of peremptory challenges to exclude potential jurors from the petit jury based on their race or gender violates the Equal Protection Clause of the Fourteenth Amendment. In <u>Batson v. Kentucky</u>, 476 U.S. 79, 106 S. Ct. 1712 (1986), the Supreme Court outlined a three-step test for evaluating whether a prosecutor's use of peremptory challenges is a constitutional violation:

Step 1:  the opponent of a peremptory challenge must establish a prima facie case of purposeful discrimination in the selection of the petit jury;

Step 2:  once the opponent makes a prima facie showing, the burden of production shifts to the proponent of the strike to come forward with a race-neutral reason;

Step 3:  the trial judge must make a determination in light of the parties' submissions whether the [opponent of the strike] has shown purposeful discrimination.

<u>Id.</u> at 96-98, 106 S. Ct. at 1723. When reviewing the resolution of a <u>Batson</u> challenge, "[a] District Court's finding as to why a juror is excused is an issue of fact, and as such, it will not be disturbed on appeal unless it is clearly erroneous or appears to have been guided by improper principles of law." <u>United States v. Allen Brown</u>, 243 F.3d 1293, 1297 (11th Cir. 2001) (quotation marks omitted). A

that only four of its peremptory challenges were used against African-Americans, i.e., jurors 13, 25, 27, and 29. Gamory's reply brief does not help resolve the issue. We will not assume that jurors 18 and 20 were African-American without sufficient evidence in the record.

26

District Court's findings regarding "whether a peremptory strike was exercised for a discriminatory reason largely involves credibility determinations and are therefore entitled to great deference." United States v. Tokars, 95 F.3d 1520, 1530 (11th Cir. 1996). Applying these principles, we conclude that Gamory has not proven a Batson violation.

Initially, the question of whether Gamory made out a prima facie case is moot because the District Court never explicitly determined whether he had done so. See United States v. Edourad, 485 F.3d 1324, 1342–43 (11th Cir. 2007). Second, we find the prosecutor's proffered explanations for exercising each of the strikes at issue were comprehensible and race neutral. See Rice v. Collins, 546 U.S. 333, 338, 126 S. Ct. 969, 973–74 (2006) ("Although the prosecutor must present a comprehensible reason, '[t]he second step of this process does not demand an explanation that is persuasive, or even plausible'; so long as the reason is not inherently discriminatory, it suffices.") (quoting Purkett v. Elem, 514 U.S. 765, 767–68, 115 S. Ct. 1769, 1771 (1995) (alteration in original)). Juror 13 harbored doubts about her ability to be impartial based upon her belief that her brother had been the victim of police brutality.[17] The prosecutor stated Juror 25

---

[17] During voir dire, Gamory also conceded as to juror 13, "she indicated there was a minor problem with some type of police brutality [] and I can understand that strike on that one."

was struck because she demonstrated difficulty reading (an observation shared by the District Court), and because the evidence might be complicated. Juror 27 stated that she did not feel she was "able to hear all of the evidence" because she was exhausted and had to care for her infant grand daughter while her daughter was attending high school. Finally, the government stated that it struck Juror 29 because he was from the Virgin Islands, as was the defendant's father, and because the Virgin Islands seem to have liberal drug views.[18] Critically, none of these characteristics is peculiar to any race. See Purkett, 514 U.S. at 769, 115 S. Ct. at 1771.

Since we find the prosecution came forward with race-neutral reasons for its peremptory strikes, we must move to step-three of the Batson analysis, which requires us to consider whether Gamory carried his burden of proving purposeful discrimination. See Rice, 546 U.S. at 338, 126 S. Ct. at 974. In making this determination, we must evaluate the "the persuasiveness of the justification" proffered by the prosecutor, while keeping in mind that "the ultimate burden of

---

[18] Before striking Juror 29, the prosecutor struck a Caucasian woman, Juror 18, because she had stated that since she was raised in France she believed that the penalties for personal use of marijuana were harsh. Cf. Miller-El v. Dretke, 545 U.S. 231, 241, 125 S. Ct. 2317, 2325 (2005) ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step.").

persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." Id. (quotation marks omitted). The District Court's "ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." Snyder v. Louisiana, 552 U.S. 472, 477, 128 S. Ct. 1203, 1207 (2008). Here, the prosecutor's proffer was not only facially race-neutral, it was persuasive. In addition, we note there were three African-Americans seated on the jury. See Puentes, 50 F.3d at 1578 ("Although the presence of African-American jurors does not dispose of an allegation of race-based peremptory challenges, it is a significant factor tending to prove the paucity of the claim."). For these reasons, we cannot conclude that the District Court clearly erred in failing to find purposeful discrimination was not clearly erroneous.

## D. MOTION FOR JUDGMENT OF ACQUITTAL

Gamory argues the District Court erred in denying his motion for judgment of acquittal on the money laundering charges, counts two and three of the indictment. He asserts the government never presented any proof establishing two of the essential elements of the money laundering charges, i.e., "that the Defendant knew the transaction involved criminally derived property . . . [and] that the property was, in fact, derived from the distribution of illegal controlled substances." See 18 U.S.C. § 1957.

We review both a challenge to the sufficiency of the evidence and the denial of a Rule 29 motion for judgment of acquittal de novo. See United States v. Frank, 599 F.3d 1221 (11th Cir. 2010); United States v. Scher, 562 F.3d 1344, 1363 (11th Cir. 2009). "[W]e view the evidence in the light most favorable to the government," making all reasonable inferences and credibility choices in the government's favor, and then "determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt." United States v. Mercer, 541 F.3d 1070, 1074 (11th Cir. 2008). We will uphold the denial of a Rule 29 motion if we "determine that a reasonable fact-finder could conclude that the evidence established the defendant's guilt beyond a reasonable doubt." United States v. Descent, 292 F.3d 703, 706 (11th Cir. 2002) (citation and quotation marks omitted).

Viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in favor of the jury's verdict, the evidence established each element of the money laundering charge. See Mercer, 541 F.3d at 1074. "The evidence need not be inconsistent with every reasonable hypothesis other than guilt, and we allow the jury to choose among several reasonable conclusions to be drawn from the evidence." See United States v. Hunt, 526 F.3d 739, 745 (11th Cir. 2008). Here, the evidence was sufficient to show that the

money Gamory used to purchase the vehicles identified in counts two and three was derived from the sale of narcotics and that Gamory knew his income resulted from that illegal activity. Thus, based upon the totality of the evidence presented, we find no error in the District Court's denial of the Fed. R. Crim. P. Rule 29 motion because a reasonable fact-finder could easily conclude that the evidence established Gamory's guilt of money laundering beyond a reasonable doubt. See Descent, 292 F.3d at 706.

## E.  CUMULATIVE ERROR

Gamory contends that, even if standing alone none of his individual claims warrants reversal, the cumulative effect of these errors requires a new trial. Where there is no error or only a single error, there can be no cumulative error. See United States v. Waldon, 363 F.3d 1103, 1110 (11th Cir. 2004). Because we have found only one error, which we hold to be harmless, there can be no cumulative error.

## III.  CONCLUSION

For these reasons, we AFFIRM Gamory's convictions for conspiracy and money laundering and his sentence of life imprisonment.

AFFIRMED.