[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-11640

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

BRANDON REDMOND,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:15-cr-00284-AT-JKL-3

_____

Before NEWSOM, LUCK, and ANDERSON, Circuit Judges.

PER CURIAM:

Brandon Redmond appeals his convictions for aiding and abetting a Hobbs Act robbery and brandishing a firearm during a crime of violence.  After careful review, we affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In 2016, a grand jury indicted Redmond, Mario Jackson, Leon Scott, Basil Varner, Dayna Liverman, and Anthony Richardson for a string of five home invasion robberies, three involving kidnappings.  Redmond was charged with three counts of aiding and abetting Hobbs Act robbery, in violation of 18 U.S.C. section 1951(a) (counts seven, ten, and twelve), three counts of brandishing a firearm during a crime of violence, in violation of 18 U.S.C. section 924(c)(1)(A)(ii) (counts eight, eleven, and thirteen), and one count of kidnapping, in violation of 18 U.S.C. section 1201(a)(1) (count nine).  Redmond's charges were tied to three robberies on June 12, June 17, and June 21, 2015.

While Redmond's case was pending, Jackson, Scott, Varner, and Liverman pleaded guilty.  The government dismissed the charges against Richardson after learning he was deceased.

*Redmond's Trial*

At Redmond's trial the government presented evidence of his involvement in the June 12 and 17 robberies through Varner's and Scott's testimony.  Varner testified that the June 12 robbery

was in Stone Mountain, Georgia, and the June 17 robbery was in Roswell, Georgia. She testified that she pleaded guilty to picking up Redmond and Jackson from both robberies. Scott testified that Redmond was his cousin and that they lived together in Memphis, Tennessee, before Scott was arrested. He testified that he met Jackson through Redmond, that Jackson and Redmond were committing home invasion robberies together, and Scott decided he wanted to participate. Scott testified that Jackson bought Scott's bus ticket from Memphis to Atlanta to commit a home invasion robbery with Jackson on May 25, 2015.

As to the June 21 robbery, victims M.M. and T.M. testified they lived together in a home in the Atlanta area. M.M. testified he was sitting in his open garage when two people walked up, put a gun to each side of his head, stole his watch and the cash in his pocket, and then one stayed with him while the other went inside. The robbers later moved him inside while they stole his firearm and T.M.'s expensive jewelry, purses, and shoes. T.M. testified that she woke up in her bed to someone hitting her and ripping her clothes off while threatening her and holding a gun to her head, demanding her jewelry and cash. She testified that one of the robbers sexually assaulted her by inserting his fingers into her vagina. Neither M.M. nor T.M. were asked to identify the robbers.

The government also presented testimony from jailhouse informant Rickey Stanley. Stanley testified that he met Redmond in prison in 2021, and that Redmond asked him if DNA could be collected "off of a hand," because he had fondled a woman during

a home invasion robbery in which he stole jewelry and watches. Stanley testified that Redmond mentioned Richardson, Jackson, Liverman, and Varner were involved in the home invasions. Stanley also testified he had a history of hallucinations, PTSD, and schizophrenia. His supervised release was at risk of being revoked due to state charges, in which case he could be sent back to prison for five years, and he was testifying in "hope[s] that something would happen for [him] in [his] favor."

Next, the government presented cell site evidence from Daniel Worrell, an investigator with the Atlanta Police Department at the time of the robberies, linking Redmond to the defendants who pleaded guilty to the robberies. Det. Worrell testified that Redmond's phone was in contact with phone numbers belonging to Jackson, Scott, Varner, and Richardson the summer the robberies took place, and specifically throughout the day on June 20, 2015. Chad Fitzgerald, a retired FBI agent specializing in cellular analysis, also testified that from 12:23 am to 1:14 am on June 21, 2015, Redmond's phone was in the vicinity of M.M. and T.M.'s home. Redmond's phone was not used in that area any other time between May and July of 2015.

After the government rested its case, Redmond moved for a judgment of acquittal. He argued there was insufficient evidence of a connection between his alleged acts and interstate commerce to sustain a Hobbs Act robbery conviction. The district court denied his motion.

*The Jury Charge and Verdict*

The district court charged the jury as to aiding and abetting Hobbs Act robbery, carrying or using a firearm during and in relation to a crime of violence, and kidnapping. The court instructed the jury that a conviction for Hobbs Act robbery requires finding that the defendant "us[ed] actual or threatened force, or violence, or caus[ed] the victim to fear harm." The district court went on to instruct that "fear" "includes the fear of financial loss." As to the firearms charges, the district court instructed that, to find Redmond guilty, the jury must also find him guilty of a violent crime, meaning the corresponding Hobbs Act robbery charge.

The jury found Redmond guilty of counts twelve and thirteen—aiding and abetting Hobbs Act robbery and brandishing a firearm during and in relation to a crime of violence—as to the June 21 robbery; it found him not guilty of the other charges.

*Redmond's Sentencing*

Just before Redmond's sentencing, T.M. provided the government with a victim impact statement she planned to read. It was directed to Redmond and stated, "[w]hile you stayed in the garage with a gun to [M.M.'s] head, Mario Jackson and your other accomplice entered our home where you did brutally terrorize and sexually assault me." The government informed the district court that T.M.'s statement was inconsistent with some of the government's trial evidence because T.M. attributed the sexual assault to Jackson, but the government had presented evidence that Redmond committed the sexual assault. Redmond moved for a new

trial under Federal Rule of Criminal Procedure 33(b)(1) based on newly discovered evidence in T.M.'s statement. He argued T.M.'s statement negated Stanley's testimony, leaving insufficient evidence to convict Redmond of the counts tied to the June 21 robbery.

The district court held a hearing on Redmond's motion for a new trial. T.M. testified she never saw Jackson or Redmond on June 21, but she could identify them by their voices because she heard them on the night of the robbery and again at a virtual bond hearing in 2021 and at Jackson's sentencing. She testified she could match the voices to "the tall guy," Jackson, and the "shorter guy," Redmond. T.M. affirmed that "[w]hat [she] wrote [in her victim impact statement] was true." T.M. also confirmed that she suffered a stroke in 2017.

The district court denied Redmond's motion for a new trial. The court explained that "Redmond ha[d] not established that a new trial which included the new evidence—T.M.'s victim impact statement and subsequent testimony—would probably produce a different result," because "there was other significant evidence at trial besides the testimony of . . . Stanley that the jury could have relied on in convicting . . . Redmond of the two counts at issue." Additionally, the district court wrote, "while the new statement include[d] a lengthy discussion attributing the sexual assault to" Jackson, "at least one sentence . . . render[ed] that statement equivocal" and its ambiguity "was not fully clarified by T.M.'s testimony at the

evidentiary hearing."  Regardless, "T.M. was consistent about one fact:  that . . . Redmond was present at the robbery."

## DISCUSSION

Redmond appeals his convictions for aiding and abetting the Hobbs Act robbery and brandishing a firearm during a crime of violence.  He argues that:  (1) his aiding and abetting the Hobbs Act robbery conviction cannot be a predicate "crime of violence" under section 924(c); (2) his aiding and abetting conviction violates the Commerce Clause; and (3) the new evidence of T.M.'s victim impact statement would probably produce a different result at a new trial.  We address each argument in turn.

*Redmond's Section 924(c) Conviction*

Redmond contends that his conviction under section 924(c) should be vacated for two reasons:  first, aiding and abetting a Hobbs Act robbery is not a predicate offense under section 924(c); and second, the district court's Hobbs Act robbery jury instruction made it so that Redmond could have been convicted based on fear of financial harm, which means he was not categorically convicted of a crime of violence under section 924(c).

Aiding and Abetting a Hobbs Act Robbery as a Predicate Offense Under Section 924(c).  First, Redmond argues that aiding and abetting a Hobbs Act robbery is not a predicate crime of violence under section 924(c).  But our precedent says otherwise.

We review de novo "[w]hether an offense is a crime of violence under [section] 924(c)." *United States v. Wiley*, 78 F.4th 1355,

1360 (11th Cir. 2023). Under section 924(c), carrying or using a firearm "during and in relation to any crime of violence" is a punishable offense. 18 U.S.C. § 924(c)(1)(A). A "crime of violence" is a felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." *Id.* § 924(c)(3)(A).

We recently affirmed that aiding and abetting Hobbs Act robbery is categorically a crime of violence under section 924(c)(3)(A), and thus is a valid predicate offense for a section 924(c) conviction.[1] *Wiley*, 78 F.4th at 1363–64 ("Because Hobbs Act robbery itself qualifies as a crime of violence . . . so does aiding and abetting Hobbs Act robbery." (citation omitted)). And Redmond was convicted of that valid predicate—the jury found that he aided and abetted the Hobbs Act robbery, in violation of section 1951(a).

Redmond contends that in *United States v. Taylor*, 596 U.S. 845 (2022), the Supreme Court explicitly abrogated our holding that Hobbs Act robbery is a crime of violence because it held that attempted Hobbs Act robbery is not a crime of violence, and "by its terms, the Hobbs Act robbery statute is indivisible as to attempted and completed robberies." But we rejected the same argument in *Wiley*. There, we explained that, "[i]n *Taylor*, the

---

[1] "Under the prior precedent rule, we are bound to follow a prior binding precedent unless and until it is overruled by this court en banc or by the Supreme Court." *United States v. Romo-Villalobos*, 674 F.3d 1246, 1251 (11th Cir. 2012) (citation omitted).

23-11640                 Opinion of the Court                 9

Supreme Court held that attempted Hobbs Act robbery is not a crime of violence. . . . [Yet t]he Court distinguished between the *completed* offense—which requires the government to prove the use, attempted use, or threatened use of force—and an *attempt* to complete that offense." *Wiley*, 78 F.4th at 1364. "Unlike attempt, aiding and abetting . . . is not a separate federal crime, but rather an alternative charge that permits one to be found guilty as a principal." *Id.* (cleaned up). "An aider and abettor of a Hobbs Act robbery necessarily commits all the elements of a principal [of a] Hobbs Act robbery." *Id.* at 1365 (citation omitted).[2]

Jury Instruction. Second, Redmond argues we should vacate his section 924(c) conviction because the district court's jury instruction on Hobbs Act robbery "authorized grounds of conviction that [are not] support[ed by section] 924(c)." We find no plain error.

"Where a party did not object to a jury instruction in the district court, we review that instruction for plain error." *United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000) (citing Fed. R. Crim. P. 30, 52(b)). "A reversal based on plain error requires that the challenged instruction be a plainly incorrect statement of the law and[] that it was probably responsible for an incorrect verdict,

---

[2] Redmond relies on two out-of-circuit decisions—*United States v. Melaku*, 41 F.4th 386 (4th Cir. 2022) and *United States v. Bowen*, 936 F.3d 1091 (10th Cir. 2019)—but even if those decisions applied here we would still be bound by *Wiley* because there is no "overlooked reason or argument exception to the prior-panel-precedent rule." *In re Lambrix*, 776 F.3d 789, 794 (11th Cir. 2015).

leading to substantial injustice." *Id.* at 1271 (cleaned up). The probability of a different result must be sufficient to undermine confidence in the outcome. *United States v. Rodriguez*, 398 F.3d 1291, 1299 (11th Cir. 2005). We review for plain error here because Redmond did not challenge the Hobbs Act robbery instruction at the district court. *Prather*, 205 F.3d at 1270.

The district court instructed the jury that a conviction for Hobbs Act robbery requires a finding that the defendant "us[ed] actual or threatened force, or violence, or caus[ed] the victim to fear harm." It then instructed that "fear" "includes the fear of financial loss," which Redmond argues was "categorically overbroad as it relates to [section] 924(c)[]" because it permitted a Hobbs Act robbery conviction for "completely non-violent" conduct. Redmond argues that under this instruction, a jury could convict him under section 924(c) without finding a predicate crime of violence.

But we reject this argument because he was not "probably responsible for an incorrect verdict, leading to substantial injustice." *Prather*, 205 F.3d at 1271 (cleaned up). Victim M.M. testified that two robbers approached and "put a gun to each side of [his] head." After stealing the watch on his wrist and the cash in his pocket, "one of them went into the house" while "the other one stayed out with a gun to [M.M.'s] head." When the robbers later brought him inside, they "were always behind [him] or had something over [his] head, poking the gun in [his] head. And if [he] tried to reason with them, they would immediately say, if you say another word, I'm going to blow your F[-]ing head off."

T.M. testified she "woke up [to] someone hitting [her] and ripping [her] clothes off . . . beat[ing her] up, and dragg[ing her] with a gun behind [her] head." She testified her assailant demanded cash and jewelry while threatening, "I will blow your head off. I will F[-]ing blow your head off." T.M. testified she was dragged from room to room as one of the robbers grabbed her jewelry, shoes, and purses. T.M. recalled that both robbers had firearms. One robber "hit [T.M.] in the face . . . and then he put his fingers up in" her vagina.

The jury found that Redmond aided and abetted the June 21 robbery "by committing and threatening physical violence." The victims' testimony and the jury's verdict both support a conviction based on "actual or threatened force, or violence, or fear of" physical injury, *see* 18 U.S.C. § 1951(b)(1), not merely fear of financial loss. Thus, the district court's instruction on "fear" did not probably cause an incorrect verdict, to the point of undermining confidence in the outcome and leading to substantial injustice. *Prather*, 205 F.3d at 1271; *Rodriguez*, 398 F.3d at 1299, 1301 ("[W]here the effect of an error . . . is uncertain or indeterminate—where we would have to speculate—the appellant has not met his burden of showing a reasonable probability that the result would have been different but for the error," nor has he "met his burden of showing prejudice" or "that his substantial rights have been affected." (citing *Jones v. United States*, 527 U.S. 373, 394–95 (1999)).

Redmond argues that "just because [the] . . . instruction may correctly define a Hobbs Act robbery, it does not follow that [that]

definition . . . categorically is a crime of violence for purposes of [section] 924(c)." But this concedes the jury instruction was not plainly erroneous because it was a "correct[] defin[ition of] Hobbs Act robbery." *See United States v. Madden*, 733 F.3d 1314, 1322 (11th Cir. 2013) ("For a plain error to have occurred, the error must be one that is obvious and clear under current law." (citation omitted)). And, as we already discussed, we have already held that aiding and abetting a Hobbs Act robbery is categorically a "crime of violence" under section 924(c). *Wiley*, 78 F.4th at 1364–65. If the jury charge accurately defined Hobbs Act robbery, and aiding and abetting a Hobbs Act robbery is categorically a crime of violence, then Redmond's argument must fail.

\*    \*    \*

Because Hobbs Act robbery is categorically a crime of violence and the jury instruction was not probably responsible for an incorrect verdict, we affirm Redmond's section 924(c) conviction.

### Redmond's Section 1951(a) Conviction

Redmond next argues the district court erroneously denied his rule 29 motion for judgment of acquittal because his Hobbs Act robbery conviction violated the Commerce Clause.

We review de novo the denial of a rule 29 motion for judgment of acquittal. *United States v. Gamory*, 635 F.3d 480, 497 (11th Cir. 2011). "We will uphold the denial of a [r]ule 29 motion if we determine that a reasonable fact-finder could conclude that the

evidence established the defendant's guilt beyond a reasonable doubt." *Id.* (quotation omitted).

The Hobbs Act applies to "[w]hoever in any way or degree . . . affects commerce or the movement of any article or commodity in commerce, by robbery." 18 U.S.C. § 1951(a). The Act defines "commerce" broadly, such that "a conviction for Hobbs Act robbery may be sustained if there is proof that the defendant's conduct had even a minimal effect on interstate commerce." *United States v. Carcione*, 272 F.3d 1297, 1300 (11th Cir. 2001). Interstate travel to carry out a robbery sufficiently affects commerce. *Id.* at 1301. So does intrastate phone communication, *id.*, because Congress's power to regulate "instrumentalities of commerce includes the power to prohibit their use for harmful purposes, even if the targeted harm itself occurs outside the flow of commerce and is purely local in nature," *United States v. Ballinger*, 395 F.3d 1218, 1226 (11th Cir. 2005); *see also United States v. Evans*, 476 F.3d 1176, 1180–81 (11th Cir. 2007) (holding that use of a cell phone, "even without evidence that [its] calls . . . were routed through an interstate system," qualifies as "interstate commerce").

Here, a reasonable factfinder could conclude the evidence established beyond a reasonable doubt that Redmond at least minimally affected interstate commerce by robbery. *See Gamory*, 635 F.3d at 497; *Carcione*, 272 F.3d at 1300. The government presented evidence that Redmond lived in Tennessee and traveled to Georgia, where the robbery occurred. Redmond concedes there "was evidence that [he] lived in Memphis and that he traveled to

Atlanta." The government also presented evidence of phone communications between Redmond, Varner, Richardson, Scott, and Jackson on June 20, and "span[ning] at least some of the robbery activity in June of . . . 2015." This evidence of interstate travel and phone communication sufficiently shows at least a minimal effect on interstate commerce to sustain Redmond's conviction. *See Carcione*, 272 F.3d at 1300–01; *Ballinger*, 395 F.3d at 1226; *Evans*, 476 F.3d at 1180–81.

Redmond contends it "should not be within the power of Congress to legislate through the Hobbs Act" this "quintessential state crime" of "participating in a robbery of a private residence." But as he acknowledges, our precedent explicitly forecloses his argument. We thus affirm the district court's denial of his rule 29 motion for judgment of acquittal.

*Redmond's Motion for New Trial Based on Newly Discovered Evidence*

Redmond's final challenge is to the district court's denial of his rule 33(b)(1) motion for a new trial based on newly discovered evidence. He argues T.M.'s victim impact statement undermines the primary evidence against him and that a new trial with this evidence would probably have resulted in a different verdict. He argues Stanley's testimony that Redmond admitted to sexually assaulting T.M. loses credibility in light of T.M.'s new identification of Jackson as her assailant.

"We review a district court's denial of a motion for new trial for abuse of discretion." *United States v. Campa*, 459 F.3d 1121, 1151 (11th Cir. 2006) (en banc) (citation omitted). "Motions for a new

trial based on newly discovered evidence are highly disfavored in the Eleventh Circuit and should be granted only with great caution. Indeed, the defendant bears the burden of justifying a new trial." *Id.* (quotation omitted). A party seeking a new trial based on new evidence must satisfy these elements: (1) the new evidence was discovered after trial; (2) the movant used due diligence to discover it; (3) the evidence is not merely cumulative or impeaching; (4) it is material to issues before the court; and (5) the evidence is such that "a new trial would probably produce a new result." *United States v. Reed*, 887 F.2d 1398, 1404 (11th Cir. 1989). The district court may not grant the motion "once it has determined that the movant has failed to satisfy any part of the five-part test." *Id.*

Redmond has not met his burden, *see Campa*, 459 F.3d at 1151, because even if a jury found that T.M.'s victim impact statement discredited Stanley, it probably would not have produced a different result, *Reed*, 887 F.2d at 1404. The government offered other evidence linking Redmond to the robbery. Cell phone evidence put him near M.M. and T.M.'s home at the time of the robbery and showed he communicated with the other defendants around the time of the robbery. Scott's and Varner's testimony connected Redmond to the string of robberies in June 2015. Additionally, Redmond was convicted without T.M. ever identifying him as a robber, but in her victim impact statement she now identifies Redmond was one of the robbers. This identification would likely be presented against Redmond in a new trial.

Redmond counters that a jury wouldn't believe T.M. could now identify Redmond's voice after so many years. He argues T.M. "never identified anyone or any trait of the perpetrators, beyond saying that she saw a black hand" on the night of the robbery, and until March 2022, she did not "provid[e] any identifying information whatsoever . . . beyond saying they were males and one had black hands." But Redmond's argument cuts both ways: To the extent T.M.'s memory of his voice can be questioned, so too can her memory that Jackson, not Redmond, was her assailant. True, T.M. didn't identify Redmond's voice until 2022, but neither did she identify her assailant until 2022. And regardless, T.M.'s statement about *who* sexually assaulted her does not refute the most critical part of Stanley's testimony that Redmond said he participated in a home invasion robbery.

Even considering that Redmond would be able to cross examine T.M. on her identification of Redmond's voice, that identification, along with the cell phone evidence and Scott's and Varner's testimony, is sufficient to conclude that a new trial would not "probably produce a new result." *Reed*, 887 F.2d at 1404. Because Redmond has not shown he qualifies for a new trial, the district court did not abuse its discretion in denying him one.

Thus, Redmond's convictions are **AFFIRMED**.