318 Ga. 431
FINAL COPY

S23A0860. BAKER v. THE STATE.

WARREN, Justice.

Appellant Morgan Baker was convicted of malice murder in connection with the shooting death of Tamarco Head.[1] In his sole enumeration of error, Baker contends that the trial court abused its discretion under OCGA § 24-4-403 ("Rule 403") by admitting into evidence a portion of a rap music video. As explained below, we agree that the trial court's admission of the video was an abuse of discretion. And because the State has not met its burden of showing that the error was harmless, we reverse Baker's conviction.

---

[1] Head was killed on July 6, 2019. In February 2021, a Houston County grand jury indicted Baker for malice murder, felony murder, and aggravated assault. At a trial from February 8 to 11, 2022, a jury found him guilty of all counts. The trial court sentenced him to serve life in prison for malice murder; the remaining counts were vacated by operation of law or merged. Baker filed a timely motion for new trial, which he later amended through new counsel. After a hearing, the trial court entered an order denying the motion in December 2022. In February 2023, Baker filed a motion to set aside that order for lack of notice. The trial court granted the motion, vacated its order, and re-entered it on March 7, 2023. Baker then filed a timely notice of appeal, and the case was docketed to the August 2023 term of this Court and orally argued on August 23, 2023.

1. (a) *The Pretrial Ruling to Admit the Rap Music Video Into Evidence*

Before trial, Baker filed a motion to exclude from evidence a music video of the rap song "Ghetto Angels" by Kobe Crawford (a rap artist known as "NoCap"), which was "filmed in early 2019" and showed Baker "holding a semi-automatic pistol with an extended magazine." The motion argued, among other things, that the video's probative value was substantially outweighed by the danger of unfair prejudice under Rule 403. After a hearing on the motion, the trial court ruled that a 33-second-long portion of the video was admissible, concluding that it was relevant to establish Baker's "identity" and the relationship between Baker and Crawford. The court also ruled, without explanation, that the "short clip [wa]s more probative than prejudicial."

(b) *The Trial*

The evidence presented at Baker's trial showed the following.[2]

---

[2] Because this case requires our assessment of whether an evidentiary

Baker was close friends with Crawford and worked as his road manager, traveling with him to various concert venues to assist with his performances. On the night of July 5, 2019, Crawford, Baker, and several other members of Crawford's "entourage"[3] drove in a black van to a nightclub in Warner Robins, where Crawford was scheduled to perform.

According to Crawford's music manager—Rodney Dunn—and the owner of the nightclub, the van parked behind the nightclub, and Crawford, Baker, and other members of the entourage hung out in a "VIP" room in the nightclub until Crawford performed around 1:00 or 1:30 a.m. The performance ended around 2:00 a.m., when the nightclub was scheduled to close, and Crawford and some of the members of the entourage left through the rear exit and got back in the van.

---

error was harmless, see Division 2 (d) below, "we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done." *Jivens v. State*, 317 Ga. 859, 863 (896 SE2d 516) (2023).

[3] Crawford's brother, one of Crawford's friends, and a man who was involved in the music industry and his friends were also part of the entourage. None of these people testified at trial.

Meanwhile, patrons left through the front door of the nightclub, where several security guards stood. Baker went out the front door with the crowd, but he then tried to go back inside the nightclub. One of the security guards testified as follows. A man, later identified as Baker, and another man who appeared to be with Baker, tried to come back inside, but the guard said that the two men could not come in because the nightclub was closed. An argument ensued, and several security guards pushed the men out the door. Baker and the other man then walked down the breezeway of the strip mall where the nightclub was located, toward a pawn shop. Several security guards, including Head, stood near the door of the nightclub, talking. A few minutes later, gunfire rang out from the direction of the pawn shop; it sounded as though there was more than one shooter. Head was shot, and he fell to the ground, dead.[4] More gunfire later erupted "right up the street."

Video recordings from the surveillance cameras at the

---

[4] The medical examiner who later performed Head's autopsy testified that she recovered no bullets or bullet fragments from Head's body.

4

nightclub showed the following.[5] At 2:04 a.m., a crowd of people filed through the front door to exit the nightclub. Baker, who had a short hairstyle and wore a white T-shirt with black writing on the front, walked outside, followed by a taller man wearing a black shirt and a camouflage ball cap. The two men stood near the door, briefly talked to a woman, and then walked down the breezeway. At 2:06 a.m., Baker and the man in the camouflage cap walked back toward the nightclub together and tried to go inside, but a few security guards stopped them. Baker and one of the security guards argued and then shoved each other, and the man in the cap lunged toward the guards. Baker pulled him back as the security guards pushed Baker and the other man out the door, and it appears that Baker and some of the guards tried to hit each other. Baker then put his arm around the man in the camouflage cap, and at 2:07 a.m., they walked down the breezeway and out of view.[6] Several of the security

---

[5] The video recordings did not include audio.

[6] It was undisputed at trial that Baker was the man in the white T-shirt who was involved in the altercation with the security guards. Baker's trial counsel mentioned this fact during his opening statement, and as discussed more below, Baker admitted it during his testimony.

guards, including Head, stood together talking in front of the door, and approximately two minutes later, Head suddenly fell down as blood spattered on the ground near him.

Dunn (Crawford's music manager) testified that after the performance that night, he got in his car, and he thought that Crawford, Baker, and the rest of the entourage got in the van, which was still parked behind the nightclub. As Dunn pulled out onto the street, following the van, he heard gunshots. He did not see anyone get into the van after he heard the shots. At some point, Dunn asked Baker if he was involved in the shooting, and Baker denied it. Dunn also testified that members of Crawford's entourage typically did not carry guns to Crawford's performances.

In response to the prosecutor's questions about the "Ghetto Angels" rap music video, Dunn testified that the song was about the death of Crawford's cousin, who had been shot 17 times years earlier; the video showed Baker and several other men waving guns; Dunn did not know what kind of gun Baker held or whether any of the guns were real or fake; and Dunn discouraged Crawford from

6

using guns in his music videos. During cross-examination, trial counsel elicited Dunn's testimony that rap artists often use guns in their music videos "to portray that they are somebody deserving of street cred" and that record labels encouraged the use of guns in music videos.

On redirect, the prosecutor introduced the 33-second-long portion of the rap music video, which the trial court admitted into evidence over trial counsel's renewed objection, and the prosecutor played the video for the jury. The first few seconds of the video showed Baker waving a black handgun, pointing it at the camera, and motioning as if he was shooting the gun while three other men rapped and made hand gestures. The video then showed Baker, Crawford, and about a dozen other men singing and dancing on and around a car; Baker waved the black handgun, sometimes pointing it at the camera, while some of the men made hand gestures, held bottles of what appears to be alcohol, and brandished guns. In response to further questions from the prosecutor, Dunn identified Baker as one of the men who was "flashing [a] firearm" and testified

7

that although Dunn did not condone guns, he could not control whether Crawford's entourage used guns in the music video or whether they carried guns on the night of the shooting. The prosecutor then asked why Crawford "promot[ed]" gun violence in the video, and Dunn responded that Crawford was not promoting it and that Crawford was simply "a rapper."

Another security guard testified that there were no security issues in the nightclub before the altercation with Baker, and that after Baker and the man in the camouflage cap walked toward the pawn shop, gunfire erupted from that direction. He did not see who shot, but the gunfire sounded like it came from "multiple guns."

A patron of the nightclub testified that shortly before the shots were fired, she was standing in the breezeway with her sister when two men walked past her toward the pawn shop. One of the men wore a white shirt; the other man, who was taller, wore a black shirt and had his arm around the man in the white shirt. She heard one of them say something like, "[D]on't worry about it; we gonna get them." She then got in a car with her sister and heard gunshots, but

8

she could not tell from which direction they came, and she did not see a shooter. The sister similarly testified that two men walked past her toward the pawn shop as she stood in the breezeway moments before the shooting; one of the men wore a white shirt and the other wore a black shirt.[7]

An off-duty police officer who was hired to provide security in the parking lot of the nightclub testified that after the nightclub closed, he heard gunshots that sounded like they were fired from multiple guns, and he saw muzzle flashes near the pawn shop. A few moments later, he heard another set of gunshots, which sounded as if a shooter was driving around outside the nightclub. He told investigators at the scene that he saw a shooter, who wore a light-colored shirt and a ball cap, near the pawn shop. At trial, he testified that he did not see a shooter or recall describing a shooter to investigators, but he insisted that what he told investigators was

---

[7] A third woman, who was with the sisters that night, testified that she heard gunshots, followed by another set of gunshots, coming from the direction of the pawn shop; she thought the shots came from only one gun; and she did not see who shot.

"definitely the truth."

Another patron, La'Destiny Orr-Oglesby, testified as follows. She was standing near her car, which was parked in front of the pawn shop, when two men in the breezeway by the shop began shooting handguns in the direction of the nightclub. One of the shooters was short; had short hair, "light" skin, and a tattoo on his left arm; and wore a white shirt with writing on the front. The other shooter was tall, had dark skin, and wore a dark shirt and a dark hat. When the men stopped shooting, they ran to a dark van that was parked on the side of the strip mall near the pawn shop. The prosecutor played the surveillance recordings showing the altercation among Baker, the man in the camouflage cap, and the security guards, and Orr-Oglesby identified Baker and the man in the camouflage cap as the shooters. She also testified that when the lead detective for the case interviewed her and showed her the surveillance recordings, she similarly identified Baker and the man

in the camouflage cap as the shooters.[8]

The lead detective testified that when Orr-Oglesby spoke to an investigator on the day of the shooting, she "g[a]ve a description of who . . . she saw shooting." (The lead detective did not elaborate further about that description.) Two days later, on July 8, the lead detective showed Orr-Oglesby a photo lineup that did not include a photo of Baker, and she did not identify any of the photos in the lineup as a photo of the shooter. The lead detective interviewed Orr-Oglesby again that day, and she said that she saw two shooters— one of the shooters was short, had light skin and a tattoo on his left arm, and wore a white T-shirt, and the other shooter wore a dark shirt and a dark hat. When the detective interviewed her again on August 21, he showed her the surveillance recordings from the nightclub, and Orr-Oglesby identified the two men who fought with security guards as the shooters.

---

[8] Orr-Oglesby also testified that in the weeks before trial, she had been arrested for a misdemeanor ticket, for driving on a suspended license, and for failing to report to her probation officer. The District Attorney's office arranged for her release from jail so that she could prepare to testify. Her charges were still pending at the time of trial.

While reviewing social media posts associated with Crawford, the lead detective found the "Ghetto Angels" rap music video; he determined that one of the men in the video was the same man shown on the surveillance recordings of the altercation with the security guards; and he "eventually learned" that the man was Baker. The prosecutor then played the rap music video for the jury again. The detective identified Crawford and Baker in the video, saying that Baker was "holding what appear[ed] to be a firearm." On cross-examination, defense counsel tendered into evidence and played for the jury a video recording of Orr-Oglesby's August 21 interview, and the detective acknowledged that Orr-Oglesby said during that interview that she "d[id]n't think the light-skinned guy was shooting."[9]

The prosecutor tendered into evidence a photo of Baker that

---

[9] During the remainder of the interview, Orr-Oglesby repeatedly referred to two shooters and gave descriptions of them that were consistent with the descriptions she gave at trial. Defense counsel asked Orr-Oglesby during cross-examination if she told the lead detective that she "d[id]n't think the light-skinned guy was shooting," and Orr-Oglesby stated that she did not remember saying that and that she "always said there w[ere] two people shooting."

was taken while he was on stage with Crawford on the night of the shooting; the photo showed that Baker had short hair and a tattoo on his left arm and wore a white T-shirt with writing on it.[10] Forensic testing showed that Baker's fingerprints were on two plastic cups found in the "VIP" room of the nightclub.

A crime scene investigator found seven .45-caliber shell casings and fifteen 9mm shell casings near the pawn shop. A firearms examiner later determined that all of the .45-caliber shell casings were fired from the same gun (although he could not determine the make and model of the gun), and all of the 9mm shell casings were fired from the same Smith & Wesson 9mm pistol. Investigators did not recover the guns used in the shooting, nor did they determine the identity of the man in the camouflage cap.[11]

---

[10] The photo, which was admitted without objection, depicted Baker gesturing as if he was shooting a gun.

[11] Investigators also found two .40-caliber shell casings in the nightclub parking lot, three 9mm shell casings north of the nightclub, and two .223 shell casings in a store parking lot a couple of blocks away. The lead detective testified that he did not know whether any of these shell casings were related to the shooting in this case. The firearms examiner determined that the 9mm shell casings found north of the nightclub were not fired from the same gun that fired the 9mm shell casings found near the pawn shop.

The defense presented testimony from two witnesses who saw shots fired in the area surrounding the nightclub around 2:00 a.m.—near the time of the shooting in this case. One of the witnesses testified that his truck was hit by a bullet as he was driving at the corner down the street from the nightclub, but he could not tell where the shots came from. The other witness testified that he saw shots fired from three vehicles—a black truck, a white Toyota Solara, and an SUV—about a block away from the nightclub.[12] The defense also presented a surveillance video recording from the nightclub that showed that about 30 minutes before the shooting in this case, a security guard escorted an unidentified man in a white shirt out of the nightclub and into the parking lot.

Baker testified in his own defense as follows. After Crawford,

---

[12] In connection with the gunshots that the witnesses described, the lead detective testified that he learned that shortly after the shooting in this case, shots were fired at an intersection about a block away from the nightclub. Investigators found 11 .40-caliber and 9mm shell casings near the intersection. The firearms examiner determined that the .40-caliber shell casings near the intersection were fired from the same gun that fired the .40-caliber shell casings found in the nightclub parking lot; the 9mm shell casings from the intersection were not fired from the gun that fired the 9mm shell casings found north of the nightclub or the 9mm shell casings found near the pawn shop.

his close friend since childhood, performed on the night of the shooting, Baker went out the front door of the nightclub to look for a woman he had talked with earlier that night. The man in the camouflage cap, whom Baker did not know but had seen in the "VIP" room at the nightclub earlier, followed him outside and tried to "latch on" to him because the man wanted to take a photo with Crawford. Baker, with the man beside him, briefly spoke to the woman, and then walked down the breezeway to look for someone else; the man in the cap followed him. Baker eventually decided to go to the van, which was parked behind the nightclub, so he tried to go back inside, and the man again followed him. When a security guard told Baker that he could not come in, Baker was angry and asked what the problem was. The security guard pushed him, and the man in the cap began yelling. Several security guards pushed Baker and the man out the door, and the man ran past Baker to fight with the guards. Baker pulled the man back and stepped between the man and a security guard; a guard punched Baker in the face as he tried to break up the fight. Baker and the man then

walked down the breezeway, and the man asked Baker if he was alright. Baker replied that he was and then walked around the side of the strip mall to the parking lot behind the nightclub, where the van was parked, as the man in the cap walked in a different direction. According to Baker, he wanted to distance himself from the man because the man had escalated the situation with the security guards. Baker then got in the van, which drove away moments later. As the van turned onto the street in front of the nightclub, Baker heard gunshots. The van then drove to Atlanta, where Baker and others in the entourage stayed overnight. Although Crawford was scheduled to perform in Tupelo, Mississippi the next night, Baker did not travel there and did not continue touring with Crawford, because Baker wanted to go home to see his infant daughter. Baker squarely denied having a gun that night or being involved in the shooting.

On cross-examination, Baker testified that he put his arm around the man in the camouflage cap as they walked down the breezeway because Baker was trying to "de-escalate the situation,"

16

since the man was still angry. The prosecutor asked whether the entourage traveled with guns, and Baker responded, "Why would we, though?" The prosecutor said, "Well, let's see why" and then played the rap music video again. In response to the prosecutor's questions about the video, Baker testified that he did not produce the video, that it was about "losing loved ones," that he thought he had "a Glock" gun in the video, he did not know "what kind" of Glock it was, it was not his gun, and he used it in the video because he was "trying to look cool." When the prosecutor asked why that made him "look cool," Baker responded, "[I]n the music industry in—in my age group, you do whatever that you think will sell, such as if—if I was to—say I was a country music artist, I probably don't like cowboy hats or cowboy boots, but I will wear it if I think it's going to help my country music sell." The prosecutor asked why Baker was "promoting" gun violence in the video, and he replied that he was not promoting it and was "[j]ust trying to be cool." The prosecutor then rewound the video and paused it at a point where it depicted Baker; she asked him if the shirt he was wearing said "Loyalty is

17

Love," and he replied that he did not know. Later, the prosecutor referenced the photo showing Baker on stage with Crawford, gesturing as if he was pointing a gun, and asked if Baker was "[p]ortraying a shooter" "[j]ust like in the video we just watched, with a real gun?" Baker replied that he was "just trying to be cool."

The State's theory of the case was that the man in the camouflage cap was part of Crawford's entourage; the man and Baker shot toward the security guards, killing Head, after the altercation at the door of the nightclub; and they then fled in the van with the rest of the entourage. During closing argument, defense counsel argued that Orr-Oglesby's testimony was not credible because she told the lead detective that the "light-skinned" man did not shoot and because she testified that the van was parked on the side of the strip mall, whereas other witnesses testified that it was parked behind the nightclub; and alternatively, that the shooter in the white shirt was someone else, as the evidence showed that shootings were frequent in that area. As to the rap music video, defense counsel argued that the video was a performance that

merely showed Baker "wanting to act cool."

The prosecutor argued in closing that Orr-Oglesby was credible, that her testimony that there were two shooters was supported by the ballistics evidence, that given the undisputed evidence showing that Baker wore a white shirt that night and that he fought with the security guards, it was improbable that the man in the cap began shooting with a different person who also happened to be wearing a white shirt, and that the evidence that Baker did not continue touring with Crawford after the shooting allowed an inference of guilt.

The prosecutor also asserted that Baker's testimony that he did not have a gun on the night of the shooting was not credible, because "[t]hey don't roll like that." She went on:

> Use your common sense. And you know why you can say they don't roll like that? Go back to that Ghetto Angels video. Right? That's all they know, the gun violence. They want to promote it. They want to live by the sword, but they don't want to die by it, right? When it's not convenient, they don't want to act like they promote the shooting.

Near the end of her argument, she asserted that "[t]his gun violence

needs to stop," saying that it was sad that the altercation at the front door ended in Head's murder. She then said, "We're better than that. We're better than that. Your job is to return a verdict." She closed by saying: "The truth is it's time to tell Morgan Baker that we're going to hold him accountable for exactly what he did that night. That we're going to h[o]ld him accountable for ending a human life. That it's not a game, it's not about a rap video. It's real." As mentioned above, the jury found Baker guilty of malice murder, among other crimes, and he was sentenced to serve life in prison.

(c) *The Denial of Baker's Motion for New Trial*

In his motion for new trial, Baker argued that the trial court abused its discretion by admitting the rap music video into evidence, asserting that the video was not relevant or probative because he never disputed that he was close friends with Crawford or that he was at the nightclub on the night of the shooting. In its order denying the motion, the trial court ruled that the video was properly admitted, because it was relevant to show that Baker was part of the entourage, that he had a motive to shoot Head, and that the lead

detective was able to identify him through the video. The trial court also concluded, apparently as part of its analysis under Rule 403, that although the video showed Baker waving a gun, the video was only about 30 seconds long and "the behavior in the video [was] not in and of itself illegal and is relatively common in today's music videos."

2. In his sole claim on appeal, Baker contends that the trial court abused its discretion under Rule 403 by admitting the portion of the rap music video into evidence. As discussed below, we agree.[13]

---

[13] Baker also makes a bare-bones assertion that the rap music video should have been excluded under the First Amendment to the United States Constitution. But given our conclusion that the video was not admissible under Rule 403 and that the error in admitting it was not harmless, we do not reach Baker's argument that the video also was not admissible under the First Amendment.

In addition, we note that the State contends that, although Baker preserved for ordinary appellate review his claim about the rap music video, he affirmatively waived any argument about the audio, i.e., the lyrics of the song featured in the video. But the lyrics in the rap music video are, for the most part, indecipherable, and Baker makes no specific arguments about why they should have been excluded. Thus, we need not address the State's contention, because the lyrics have no bearing on our conclusion that the rap music video was improperly admitted. We note that the dissenting opinion appears to argue that the unintelligibility of the lyrics in the rap music video "further diminish[ ] any danger of unfair prejudice" under Rule 403, but the lyrics' unintelligibility would only mitigate any unfair prejudice flowing from the lyrics themselves—not any unfair prejudice from the images in the video, to which we have limited our review here.

(a) *The Applicable Law*

We begin with a review of the law that applies to Baker's claim. Under OCGA § 24-4-401 ("Rule 401"), "relevant evidence" is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." "The test for relevance is generally a liberal one, and [r]elevance is a binary concept—evidence is relevant or it is not." *Harris v. State*, 314 Ga. 238, 262 (875 SE2d 659) (2022) (citations and punctuation omitted). Under OCGA § 24-4-402 ("Rule 402"), relevant evidence is generally admissible, and evidence that is not relevant is not admissible. Rule 402 also says, however, that the admissibility of relevant evidence may be "limited by . . . law or by other rules." OCGA § 24-4-402. One such limiting rule is Rule 403, which says, "Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative

22

evidence."

We have often reiterated that "the major function of Rule 403 is to exclude matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *Harris*, 314 Ga. at 262-263 (citation and punctuation omitted). To that end, we have explained probative value in this way:

> Generally speaking, the greater the tendency to make the existence of a fact more or less probable, the greater the probative value. And the extent to which evidence tends to make the existence of a fact more or less probable depends significantly on the quality of the evidence and the strength of its logical connection to the fact for which it is offered. Probative value also depends on the marginal worth of the evidence—how much it adds, in other words, to the other proof available to establish the fact for which it is offered. The stronger the other proof, the less the marginal value of the evidence in question. And probative value depends as well upon the need for the evidence. When the fact for which the evidence is offered is undisputed or not reasonably susceptible of dispute, the less the probative value of the evidence.

*Olds v. State*, 299 Ga. 65, 75-76 (786 SE2d 633) (2016) (citations and footnotes omitted).

As to the evaluation of prejudice under Rule 403, we have said that "in a criminal trial, inculpatory evidence is inherently

prejudicial; it is only when *unfair* prejudice substantially outweighs probative value that the rule permits exclusion." *Harris*, 314 Ga. at 263 (citation and punctuation omitted; emphasis in original). The term "unfair prejudice," as it is used in Rule 403, refers to "the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on an improper basis rather than on proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172 (117 SCt 644, 136 LE2d 574) (1997).[14] Generally, such improper bases for a finding of guilt include a criminal defendant's bad character or his propensity for violence. See, e.g., id. at 181-182 (explaining that the risk that a jury will reach a guilty verdict "'because a bad person deserves punishment'" creates a substantial prejudicial effect) (citation omitted); *Harris*, 314 Ga. at 271 (noting that "'[i]t does not follow because an accused person may have a bad character that he is guilty of the particular offense for which he is being tried'") (citation omitted).

---

[14] Because OCGA § 24-4-403 is "materially identical" to Federal Rule of Evidence 403, we look to federal appellate cases for guidance in interpreting the rule. See *State v. Almanza*, 304 Ga. 553, 556-558, 560 (820 SE2d 1) (2018).

In all, however, "the exclusion of evidence under Rule 403 is an extraordinary remedy which should be used only sparingly." *Harris*, 314 Ga. at 262 (citation and punctuation omitted).

(b) *Relevance of the Rap Music Video*

As an initial matter, we note that Baker does not argue that the rap music video was not relevant evidence under Rules 401 and 402. Indeed, as the trial court indicated in its orders regarding the admission of the rap music video, the video tended to prove that Baker was involved in Crawford's rap music business and was part of his "entourage," making it more likely that Baker was present at the nightclub just after Crawford's performance, around the time of the shooting. Thus, the video was relevant in that respect and satisfies Rule 401.

The State argues that the video was also relevant with respect to four other purposes. First, the State asserts that the video was relevant as "intrinsic evidence" to complete the story of the crime. Second, the State claims that the video was relevant to identity because the lead detective testified that during his investigation, he

reviewed the video, determined that one of the men in the video was the same man shown on the surveillance recordings of the altercation with the security guards, and "eventually learned" that the man was Baker. The State also asserts that the video was relevant to establish Baker's motive to shoot toward the security guards—that Baker's involvement in the entourage caused him to believe he was "a big shot" and become enraged when the security guards "disrespected" him. Finally, the State argues that the video was relevant to show that Baker had access to the guns used during the shooting. Because Baker does not argue that the video was not relevant, and particularly because "[t]he test for relevance is generally a liberal one," we will assume without deciding that the video was relevant for these purposes as well. See *Harris*, 314 Ga. at 262, 272 (assuming without deciding that evidence of the appellant's sexual messages and conduct was relevant under Rule 401 to prove his motive to murder the victim before ultimately concluding that much of the evidence was not admissible under Rule 403).

(c) *Admissibility of the Rap Music Video under Rule 403*

Turning to Rule 403, the rap music video had little, if any, probative value in proving the points discussed above. First, the video's probative force to show that Baker was part of Crawford's entourage and was present at the nightclub around the time of the shooting was minimal. That is because at trial, Baker did not dispute—and in fact admitted—that he was close friends with Crawford; he was Crawford's road manager; he toured with Crawford as part of his entourage; he traveled in the van with Crawford to the nightclub; he hung out in the "VIP" room; and when security guards refused to let him back inside the nightclub, he and the man in the camouflage cap fought with them.[15] In addition, the

---

[15] In particular, defense counsel told the jury during his opening statement that Baker and Crawford had been "friends since adolescence"; Baker "was working for [Crawford] as his road manager"; Baker toured the country with Crawford to assist with "dozens of shows"; Baker traveled with Crawford in the van to the nightclub in Warner Robins; they "were directed to this VIP area"; after the show, security guards prevented Baker from re-entering the nightclub, and Baker (along with the unknown man in the camouflage cap) got into an altercation with the guards. And Baker admitted during his direct examination that Crawford was a "very close friend"; the two had known each other since Baker was "four years old"; he worked as Crawford's road manager and toured with him; he traveled in the van with

27

State presented other substantial evidence to establish Baker's relationship with Crawford and his presence at the nightclub, including Dunn's testimony on those points, the surveillance recordings from the nightclub showing Baker fighting with security guards, a photo of Baker and Crawford on stage at the nightclub, and evidence that Baker's fingerprints were on two plastic cups in the "VIP" room. Put simply, given the extensive, definitive, and undisputed evidence that Baker worked for and traveled with Crawford and that Baker was at the nightclub near the time of the shooting, it was not necessary to show the rap music video—which supported only the inference that Baker was part of Crawford's entourage. Thus, the rap music video was minimally probative to establish those points. See *Olds*, 299 Ga. at 76 & n.15 (explaining that if a point is proved by other strong evidence, "the marginal value of the evidence in question" is decreased and that "'[i]f the

Crawford to the nightclub in Warner Robins; they went to the "VIP" room; he sometimes performed on stage with Crawford; he was on stage during Crawford's performance at the nightclub; and he and the man in the camouflage cap fought with security guards.

28

evidence . . . is cumulative of evidence already introduced, exclusion is more likely'") (citation omitted).

For similar reasons, the rap music video lacked any significant probative value to complete the story of the crime (and thus had little, if any, value as intrinsic evidence) or to establish identity by proving how the lead detective determined that Baker was the man shown in the surveillance recordings of the fight at the nightclub. As we explained above, Baker admitted—and other evidence established—the aspects of the "story of the crime" that the State asserts the rap music video proved. And the lead detective's determination that Baker was the man shown in the surveillance recordings was a detail of the investigation that was of little consequence, particularly in light of Baker's admission and the other undisputed evidence proving that he was in fact the man shown on the recordings. See *Olds*, 299 Ga. at 76 & n.15.

The probative value of the rap music video to show Baker's motive was also negligible, at best. In this respect, the State failed to show a "logical and necessary link" between Baker's waving and

pointing a gun during his performance of a rap song and his motivation to shoot toward the security guards at the nightclub. If anything, the alleged "link" between the video and Baker's motive appears to be the video's portrayal of Baker as a violent gunman—a link that essentially amounts to impermissible propensity evidence. *Kirby v. State*, 304 Ga. 472, 486-487 (819 SE2d 468) (2018) (explaining that "[m]otive is the reason that nudges the will and prods the mind to indulge the criminal intent" and that evidence of motive "must be logically relevant and necessary to prove something other than the accused's propensity to commit the crime charged") (citations and punctuation omitted). See also *Harris*, 314 Ga. at 270 (noting that evidence of an alleged motive that lacks a specific, logical link to the alleged crimes often supports only improper propensity arguments). Moreover, the State presented evidence apart from the rap video—the surveillance recordings and testimony from two security guards—to establish Baker's alleged motive to shoot toward the security guards because he believed that they had "disrespected" him. See *Olds*, 299 Ga. at 76 & n.15.

Finally, the rap music video's probative value to prove that Baker had access to the guns used during the shooting was, at most, trivial. We acknowledge that because there was no proof connecting Baker to the guns used in the shooting, which the evidence indicated were a .45-caliber gun of an undetermined make and model and a Smith & Wesson 9mm pistol, the State had a real need to tie Baker to those guns. But the rap music video tended to prove little, if anything, about Baker's access to those types of guns near the time of the shooting. First, although Baker claimed in his pretrial motion to exclude the video that it was "filmed in early 2019," the State offered no evidence at trial about when the performance was recorded, which reduced the video's probative force to prove that Baker had access to guns near the time of the shooting in July 2019. And the State did not argue at trial or present any evidence showing that the gun Baker waved around in the rap music video was used, or even could have been used, in the shooting. The only evidence presented at trial about the gun Baker held in the rap music video was Dunn's testimony that he did not know the gun's type (or even

31

whether it was real or fake) and Baker's similar testimony that the gun was not his, he did not know its type, he thought it was "a Glock," and he used it in the performance "to look cool." Thus, the rap video established only that at some unidentified point in time, Baker held what may have been a Glock handgun during a rap music performance. See *Olds*, 299 Ga. at 75 (explaining that "'[p]robative value refers to the strength of the connection between the evidence and what it is offered to prove'") (citation omitted). Compare *Wilson v. State*, 315 Ga. 728, 739-740 (883 SE2d 802) (2023) (holding that the trial court did not abuse its discretion under Rule 403 by admitting into evidence a rap music video that was filmed 11 days after the victim's murder and showed the appellant's co-defendants "flash[ing]" a handgun that two witnesses testified was the murder weapon); *United States v. Smith*, 967 F3d 1196, 1204-1206 (11th Cir. 2020) (holding that the trial court did not abuse its discretion under Federal Rule of Evidence 403 by admitting evidence of the appellant's rap music video, which showed him holding a pistol that the robbery victim testified was similar to the

32

one he used to strike her).[16]

In contrast to the exceedingly low probative value of the rap music video, the prejudice flowing from the evidence the State presented that Baker waved a handgun, pointed it directly at the camera, and mimicked shooting the gun while rapping on a street with a large group of men, some of whom also brandished guns and made hand signs, was high. As the trial court noted in discussing the rap music video at trial (outside the presence of the jury), "the video [was] . . . glorifying of violence and gun violence and a sort of street life, glamorizing it."

---

[16] We note that the probative value of the rap music video was further diminished by the State's failure to present any evidence that Baker's performance of Crawford's rap song was not wholly theatric. See *United States v. Gamory*, 635 F3d 480, 493 (11th Cir. 2011) (explaining that a rap video was minimally probative under Federal Rule of Evidence 403 because there was no proof that the appellant "authored the lyrics or that the views and values reflected in the video were, in fact, adopted or shared by [the appellant]"); *State v. Skinner*, 218 N.J. 496, 521 (95 A3d 236) (2014) ("The difficulty in identifying probative value in fictional or other forms of artistic self-expressive endeavors is that one cannot presume that, simply because an author has chosen to write about certain topics, he or she has acted in accordance with those views."); *Commonwealth v. Gray*, 463 Mass. 731, 753-755 (978 NE2d 543) (2012) (explaining that a rap music video was "minimally if at all probative" because there was no evidence that the rap lyrics were biographical or indicative of the appellant's motive).

Yet the record shows that the trial court's failure to recognize the danger of unfair prejudice from the video when it ruled on its admissibility enabled the State's improper use of the video throughout the trial. In particular, the trial court allowed the prosecutor to capitalize on the video's prejudicial impact by emphasizing the video not to prove the purposes for which the State now asserts the video was probative (i.e., to complete the story of the crime, to establish Baker's identity, to show Baker's motive, or to prove that Baker had access to the guns used in the shooting), but for the purpose of showing Baker's alleged propensity for violence based on the theory that he was associated with a rap artist. For example, when examining Dunn, the lead detective, and Baker, the prosecutor emphasized the portion of the rap video in which Baker waved a handgun, and she asked Dunn and Baker about the video's "promoting" gun violence—even though she did not offer argument, let alone evidence, that the gun shown in the video was the gun used in the shooting. And when the prosecutor asked Baker whether the entourage traveled with guns and he responded, "Why would we,

though," she again used the video to exaggerate Baker's violent nature, saying "Well, let's see why," before she played the video for the jury a third time. Even worse, during closing argument, the prosecutor expressly asserted that the rap music video proved that those who participate in making rap music, such as Baker, had a propensity for violence, saying, "Go back to that Ghetto Angels video. Right? That's all they know, the gun violence. They want to promote it." The prosecutor then drew a comparison between the shooting and the rap music video, stating, "[I]t's not a game, it's not about a rap video. It's real." See, e.g., *Brown v. State*, 303 Ga. 158, 162-163 (810 SE2d 145) (2018) (explaining that the probative value of evidence that the appellant committed a prior aggravated assault was "extremely low at best" and was "'substantially outweighed by its danger of creating prejudice,'" because the evidence had "'no purpose other than to show appellant's propensity toward violence'") (citation omitted).[17]

---

[17] The dissenting opinion says in passing that it does "not condone the prosecutor's potential misuse of the video to make a propensity argument." But

The unfair prejudice from the evidence of the rap music video substantially outweighed its minimal probative value, making this evidence the sort that Rule 403 was meant to exclude: "matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *Harris*, 314 Ga. at 277 (citation and punctuation omitted). The trial court therefore abused its discretion under Rule 403 by admitting the rap music video into evidence. See id. at 274-280 (holding that the trial court abused its discretion under Rule 403 by admitting evidence of the appellant's sexual activities on the day before the victim's death, which had "trivial probative value" and was "very prejudicial"); *Jackson v. State*, 306 Ga. 69, 79-80 (829 SE2d 142) (2019) (holding that the trial court abused its discretion under the Rule 403 part of the test pursuant to OCGA § 24-4-404 (b) by admitting evidence that the appellant was involved in a prior shooting, because the probative value of the evidence was "minimal at best"; it was "undoubtedly prejudicial";

it undermines that disavowal by focusing on the amount of time the rap music video was shown to the jurors instead of on the significantly harmful ways the prosecutor used the video even when it was not being played.

and the prosecutor enhanced the prejudice by extensively questioning the appellant about the prior shooting to try to establish that he was "someone with a violent character"). See also *United States v. Gamory*, 635 F3d 480, 493 (11th Cir. 2011) (holding that the trial court abused its discretion under Federal Rule of Evidence 403 by admitting evidence of a rap music video and explaining that "the probative value of the rap video was minimal at best," partly because any facts that the video made more probable "were not seriously contested at the time the video was introduced" and there was no evidence that the appellant adopted the "views and values reflected in the video," while "the substance of the rap video was heavily prejudicial," as the lyrics "could reasonably be understood as promoting a violent and unlawful lifestyle").[18]

---

[18] The dissenting opinion concludes that the admission of the rap music video was not an abuse of discretion under Rule 403, asserting that we have overestimated the unfair prejudice from the video and downplayed its probative value. In determining that the video was not overly prejudicial, the dissenting opinion ignores the prosecutor's repeated questions and arguments about the video's (and Baker's) "promoting" gun violence, which improperly emphasized Baker's alleged propensity for violence. And the dissent's assertion that, by considering the prosecutor's improper closing arguments about the rap music video in assessing unfair prejudice, we have "conflate[d] the question of

37

unfair prejudice under Rule 403 with the question of whether the video, in the context of the entire trial, was harmful or harmless," is simply incorrect. In weighing probative value and unfair prejudice under Rule 403, a trial court should consider how the evidence at issue might be used within the context of the evidence and arguments presented at trial, including how a prosecutor could capitalize on the prejudicial effect of the evidence during closing argument. And in reviewing whether a trial court abused its discretion in conducting Rule 403's balancing test, an appellate court may properly consider whether the risk of unfair prejudice was actualized at trial. See, e.g., *Whited v. State*, 315 Ga. 598, 605-606 (883 SE2d 342) (2023) (noting, in considering unfair prejudice under Rule 403, that the State's opening statements and closing arguments did not focus on the evidence at issue); *Harris*, 314 Ga. at 273-280 (noting the trial court's pretrial ruling admitting evidence of the appellant's sexual messages and conduct under Rule 403 and then, in concluding that the court abused its discretion, considering all of the evidence presented at trial—including the State's theory at trial of the appellant's motive; whether the evidence at issue was needlessly cumulative of other evidence presented at trial; the probative value of the evidence, in light of the other strong evidence presented at trial that proved the same point; and the unfair prejudice flowing from the evidence at trial, which was "compound[ed]" by the fact that the prosecutor hinted during his closing argument that the appellant had not been charged with any crimes related to the evidence that he sent sexual messages to a child); *Jackson*, 306 Ga. at 78-79 (holding that the trial court abused its discretion under the Rule 403 part of the test pursuant to OCGA § 24-4-404 (b) by admitting evidence that the appellant was involved in a prior shooting, and evaluating as part of that analysis the State's need for the evidence—given the other evidence presented at trial—and its prejudicial effect—which was "enhanced" by the prosecutor's extensively questioning the appellant about the shooting for the purpose of "establish[ing the appellant] as someone with a violent character"); *Kirby*, 304 Ga. at 486 (concluding that the trial court abused its discretion under the Rule 403 part of the test pursuant to OCGA § 24-4-404 (b) by admitting evidence that the appellant committed a prior armed robbery and aggravated assault, and discussing as part of that analysis its low probative value in light of the other strong evidence presented at trial to prove the same point and its prejudicial effect, which was "reduced" because the jury was presented with other evidence that the appellant had committed another assault and robbery).

As to the dissenting opinion's assessment that the video's probative value was more significant than we acknowledge because the video "showed

(d) *Harm*

Having concluded that the trial court abused its discretion under Rule 403 by admitting the excerpt of the rap video into evidence, we must now assess whether that error caused harm that warrants a reversal of Baker's conviction. "'The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict.'" *Jivens v. State*, 317 Ga. 859, 863 (896 SE2d 516) (2023) (citation omitted). Accordingly, the error in admitting the rap music video into evidence may be deemed harmless only if "'it is highly probable that the error did not contribute to the verdict.'" Id. (citation omitted). Applying that

---

that Baker was familiar and comfortable with handguns," we have explained time and again that when evidence is not particularly strong to prove the point for which it is offered, the probative value of the evidence is diminished, not increased. See, e.g., *Olds*, 299 Ga. at 75-76. Here, the State did not use the video to connect the gun used in the crimes to the gun Baker held in the video, so the video was not strong evidence and had little probative value in that respect.

In sum, the dissent misses the point: the contents of the video, standing alone, were not particularly prejudicial. But the video's exceedingly low probative value, compared to its outsized risk of unfair prejudice, made its admission an abuse of discretion under Rule 403. And indeed, that risk—which was apparent at the time the trial court had to decide whether to admit the video—was actualized by the prosecutor's improper use of the video to show Baker's propensity for gun violence.

standard, we conclude that the trial court's error in this case was not harmless.

As discussed above, the rap music video was highly prejudicial. It allowed the State to introduce impermissible propensity evidence by portraying Baker as a threatening gunman, and the prosecutor severely exacerbated the video's prejudicial impact by emphasizing that it showed Baker's predisposition to gun violence. Although the video excerpt was relatively brief—it was only about 30 seconds long (as the trial court pointed out in its order denying Baker's motion for new trial)—the prosecutor made it a focal point of the trial. She played the video for the jury three times at three different points during the trial; questioned three witnesses about the video (specifically highlighting that the video advocated gun violence); and then emphasized during her closing argument that Baker and other rap artists "promote[d]" gun violence, because "[t]hat's all they know," a pointed argument that reinforced to the jury Baker's alleged violent character. See, e.g., *Strong v. State*, 309 Ga. 295, 317 (845 SE2d 653) (2020) (noting, in reversing the appellant's

convictions on the ground that an evidentiary error was not harmless, that the State "emphasized" the evidence during closing argument); *Thompson v. State*, 302 Ga. 533, 542 (807 SE2d 899) (2017) (explaining, in reversing the appellant's convictions due to the improper admission of evidence that was not harmless, that the prosecution emphasized during closing argument that the evidence showed that the appellant had a propensity to commit crimes).[19]

---

[19] We note that the trial court instructed the jury during the final charge that the lawyers' closing arguments were not evidence, but under these circumstances, that generalized instruction was not sufficient to cure the prejudicial impact of the prosecutor's improper propensity argument. Cf. *Jones v. State*, 292 Ga. 656, 662 (740 SE2d 590) (2013) (explaining that the standard instruction that closing arguments are not evidence was insufficient to cure the prosecutor's "highly prejudicial" improper argument that the appellant was involved in another shooting, which was not supported by any evidence at trial, in violation of OCGA § 17-8-75).

In addition, the State contends that other aspects of the trial mitigated any harm from the admission of the video: namely, that in response to the prosecutor's questions during jury selection about whether potential jurors had heard about rap artists committing crimes and whether that would "color [their] perception" of the case, no jurors expressed any bias, and that defense counsel elicited testimony indicating, and asserted during closing argument, that the video was a performance that merely showed Baker "wanting to act cool." We disagree. The jurors' general attitudes toward rap artists at the time of jury selection says little, if anything, about how they responded to the prosecutor's belaboring of the improperly admitted evidence of the rap music video at trial. See *Hill v. State*, 308 Ga. 638, 648 (842 SE2d 853) (2020) (explaining that although the jurors stated during jury selection that they could remain impartial even though the appellant was visibly shackled during the trial, at that point in the proceedings, they could "only speculate" as to how

Moreover, other than the improperly admitted evidence of the rap music video, the State offered no connection between Baker and guns. The State introduced no evidence showing that Baker carried or had access to guns regularly, much less that he was carrying a gun on the night of the shooting or that the gun displayed in the rap video was used in the shooting. In short, the way in which the rap music video was used at trial aggrandized a connection between Baker and gun violence that was not properly established by any other evidence. Under these circumstances, the evidence of the rap music video was not "'relatively benign' or merely cumulative, as we often have concluded in cases deeming improperly admitted evidence harmless." *Harris*, 314 Ga. at 284 (citation omitted). Compare *Jivens*, 317 Ga. at 864 (explaining that the allegedly improper admission of photographs of the appellant with firearms

---

they would feel after being exposed to the practice; accordingly, the jurors' statements did not render the trial court's error in requiring the appellant to be shackled at trial harmless). As to the testimony and argument that the video simply showed Baker's attempt "to act cool," we acknowledge that defense counsel's response to the video reduced its harmful effect, but that slight mitigation was outweighed by the prosecutor's repeated and improper use of the video to show Baker's alleged propensity for gun violence.

was harmless, partly because "any prejudicial effect these photographs may have had was minimized by properly admitted evidence that [the appellant], in fact, had access to guns").

By contrast, the other evidence showing that Baker participated in shooting Head was not especially compelling, especially given the equivocation of multiple witnesses. See *Harris*, 314 Ga. at 284 (explaining that "'compelling properly admitted evidence of guilt'" may offset a high risk of prejudice from improperly admitted evidence) (citation omitted). See also OCGA §§ 16-5-1 (a) (defining malice murder); 16-2-20 (defining parties to a crime). As we recounted in Division 1 above, only one eyewitness—Orr-Oglesby—identified Baker as a shooter, and although she said during her interviews with the lead detective that she saw two shooters, provided a description of one of the shooters that matched Baker, and then identified Baker during her interview with the detective in August 2019 and again at trial, she also said during her August 2019 interview that she "d[id]n't think the light-skinned guy" (referring to Baker) was a shooter. Moreover, evidence was

43

presented that after that interview and at the time of trial, Orr-Oglesby had a motive to testify against Baker, because she had recently been arrested on several criminal charges that were still pending, which authorized the jury to make additional inferences that might undermine Orr-Oglesby's credibility.

The State points out that Orr-Oglesby's account at trial was supported by other evidence—including the surveillance recordings showing Baker (in a white shirt) and the man in the camouflage cap (in a black shirt) walking together toward the pawn shop; testimony that patrons saw a man in a white shirt walking with a man in a black shirt toward the pawn shop, saying something like, "we gonna get them," moments before the shooting; and the shell casings near the pawn shop, which indicated that two guns were used in the shooting. Notably, however, Orr-Oglesby's account was also contradicted by other evidence. Orr-Oglesby testified that Baker and the man in the camouflage cap shot and then fled in a van that was parked on the side of the strip mall, but Dunn testified that he did not see anyone get into the entourage's van, which had been parked

44

behind the strip mall, after he heard gunshots. Moreover, in contrast to Orr-Oglesby's testimony, the off-duty police officer told investigators at the crime scene that he saw a shooter (with no mention of a second shooter) wearing a light shirt and a ball cap. And although the ballistics evidence showed that two guns were shot near the pawn shop, witnesses testified that they also heard another set of gunshots; the defense presented evidence that shots were fired from three vehicles (the descriptions of which did not match the entourage's van) near the nightclub around the time of the shooting; investigators found several additional shell casings in that area; and the State presented no evidence of the type of bullet that killed Head.

To be sure, the State presented substantial evidence of Baker's motive to participate in the shooting: namely, that he and the man in the camouflage cap were angry with the security guards after the fight. But Baker did not dispute that he and the man in the cap fought with the guards or that he was angry. And to rebut the State's theory that his anger motivated him to perpetrate a shooting with

45

the man in the cap, Baker provided a not-implausible account: after the fight, he simply parted ways with the man—whom he did not know and whose presence he wanted to leave, given that the man had escalated the fight—and got in the van, where he then heard gunshots.[20]

Given all of this evidence, we cannot say that it is "highly probable" that the trial court's improper admission of the evidence of the rap music video did not contribute to the guilty verdict, and thus the State has not met its burden of showing that the error was harmless. We therefore reverse Baker's malice murder conviction.

---

[20] The dissenting opinion contends that our harmless-error analysis is "incomplete because it fails to account for the fact that Baker elected to testify at his trial," which it suggests would diminish the harm of the error in admitting the rap video because "the jury did not find [Baker] credible." But we have accounted for Baker's testimony above, concluding that his version of the events on the night of the shooting was not implausible. Although the jury was authorized to disbelieve Baker's account, we would expect that the prosecutor's repeated use of the video to emphasize Baker's alleged propensity for gun violence would have significantly undermined his credibility with the jurors. In other words, the prosecutor's use of the video to emphatically cast Baker as a violent gunman before the jury had an opportunity to listen to Baker's own account and assess his credibility made it more likely that the jury would disbelieve Baker's testimony not because it was unworthy of belief, but because he had been portrayed as the sort of person who would commit a crime like the one with which he was charged.

See, e.g., *Harris*, 314 Ga. at 288-289 (reversing the appellant's convictions due to the improper admission of evidence under Rule 403, which was not harmless, because the evidence was highly prejudicial and the proof of the appellant's guilt "was not 'overwhelming,' 'compelling,' or even strong"); *Strong*, 309 Ga. at 316-318 (reversing the appellant's convictions on the ground that improperly admitted evidence was not harmless, because the evidence was highly prejudicial and not cumulative of other, properly admitted evidence; the State emphasized the evidence at trial; and the other evidence of the appellant's guilt was "not overwhelming," particularly given that the State's two eyewitnesses gave somewhat inconsistent accounts of the murder and the appellant "provided a not-outlandish account of the incident"); *Heard v. State*, 309 Ga. 76, 91 (844 SE2d 791) (2020) (reversing the appellant's convictions based on improperly admitted evidence that was not harmless, because the evidence was "highly prejudicial and not at all cumulative . . . and the evidence that [the appellant]

47

committed the charged crimes was not compelling").[21]

*Judgment reversed. All the Justices concur, except Boggs, C. J., and LaGrua, J., who dissent.*

LaGrua, Justice, dissenting.

The majority opinion holds that the trial court abused its discretion by admitting the 33-second clip from a rap music video into evidence because the video's "probative value [was] substantially outweighed by the danger of unfair prejudice[.]" OCGA § 24-4-403 ("Rule 403"). Under such circumstances, reversal is only necessary if the error was harmful, which the majority opinion also

---

[21] Although the evidence presented at trial was not especially strong, when viewed in the light most favorable to the verdicts, it was constitutionally sufficient to sustain the jury's guilty verdicts. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979); *Hamilton v. State*, 317 Ga. 337, 340 (893 SE2d 54) (2023) (concluding that the evidence, which showed that the appellant initiated a dispute with the victim and then participated with his co-defendant in shooting him, was constitutionally sufficient to support the appellant's conviction for felony murder based on aggravated assault); *Draughn v. State*, 311 Ga. 378, 381-382 (858 SE2d 8) (2021) (holding that the evidence supporting the appellants' convictions for malice murder was constitutionally sufficient, partly because an eyewitness identified them as the assailants, and explaining that although there was conflicting evidence as to their involvement, "'[i]t is the jury's role to resolve conflicts in the evidence and to determine the credibility of witnesses, and the resolution of such conflicts adversely to the defendant does not render the evidence insufficient'") (citation omitted). Thus, the State may retry Baker if it so chooses. See *Harris*, 314 Ga. at 289; *Strong*, 309 Ga. at 318 n.25.

holds. I disagree as to both. The trial court did not err in admitting the video, but, even if it did, any error was harmless. Because I would affirm the judgment of the trial court, I respectfully dissent.

It is uncontested—even admitted by Baker and captured on camera—that Baker and a man in a camouflage cap attempted to reenter the nightclub shortly after 2:00 a.m., but they were denied reentry after a brief argument and physical struggle with the security guards. Baker and the man in the camouflage cap walked away in the direction of a pawn shop, with Baker placing his arm around the man in the camouflage cap. Uncontested evidence also shows that one of those security guards near the door was shot and killed minutes later. At least five witnesses testified that the gunfire came from the direction of the pawn shop, where shell casings were also found. Surveillance footage did not capture the shooting, but Orr-Oglesby testified that she saw two men matching the descriptions of Baker and the man in the camouflage cap both shooting guns toward the nightclub from the direction of the pawn shop. Another nightclub patron testified that she saw two men

49

walking toward the pawn shop, one with his arm around the other, and she heard one say, "we gonna get them," followed shortly by gunfire. Baker testified that, by the time the shooting started, he had already parted with the man in the camouflage cap and boarded the van. However, no other witnesses, including Dunn, could corroborate that Baker was in the van before the shooting. Accordingly, the majority opinion concludes that this evidence was constitutionally sufficient to support Baker's conviction. Majority Op. at 452 n.21.

But the majority opinion also holds that all this evidence "was not especially compelling." Majority Op. at 450. I do not agree; rather, the evidence against Baker was substantial. To support its contrary holding, the majority opinion undermines Orr-Oglesby's identification of Baker as the shooter by listing *multiple* instances in which she identified Baker as the shooter but *one* instance where she equivocated. However, the majority opinion also acknowledges that the core of her testimony was largely consistent with other uncontested evidence. She heard some commotion at the front door

of the nightclub and then saw two men near the pawn shop shooting toward the nightclub—two men that were identified at trial as Baker and the man in the camouflage cap. The inconsistencies highlighted by the majority opinion generally do not contradict that narrative, except for the testimony of an off-duty police officer at the scene, who testified that he "couldn't get a good sight of any shooters" and could barely remember what he saw. The majority opinion also explains that Orr-Oglesby had a motive to lie because she was on probation and was recently arrested on a bench warrant for a completely unrelated misdemeanor in a separate county, a motive which I find weak and irrelevant considering that she was not facing those charges during her prior identification of Baker.

Now to the question on appeal: did the trial court abuse its discretion by admitting the video under Rule 403, and, if so, was it harmful error? The majority opinion answers "yes" to both questions for roughly the same reason: "the rap music video was highly prejudicial." Majority Op. at 448. I disagree.

I do not agree that the danger of *unfair* prejudice *substantially*

*outweighed* the video's probative value, which is the difficult test that Rule 403 sets out. The video was not as prejudicial as the majority opinion holds. "[I]n reviewing issues under Rule 403, we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." *Lee v. State*, 318 Ga. 412, 419 (4) (c) (897 SE2d 856) (2024) (citation and punctuation omitted). The 33-second clip simply shows Baker and others singing, smiling, dancing on a car, and waving around handguns, with Baker removing and inserting an extended magazine. The video was not particularly offensive or unusual. "A defendant's appearance in a rap video . . . is not per se prejudicial." *Wilson v. State*, 315 Ga. 728, 739 (8) (a) (883 SE2d 802) (2023). This is true even when the video is "replete with obscenities and racial slurs." Id. But here, the lyrics were largely indecipherable, see Majority Op. at 440 n.13, further diminishing any danger of unfair prejudice. Cf. *United States v. Gamory*, 635 F3d 480, 493 (II) (B) (11th Cir. 2011) (holding that the "substance of the rap video was heavily prejudicial" because the lyrics "could

reasonably be understood as promoting a violent and unlawful lifestyle").

The real issue garnering the majority opinion's focus is the State's use of the video once admitted. The video was played three times: first during Dunn's testimony, second during the lead detective's testimony, and last during Baker's testimony. However, each time, the video was used for a permitted purpose. In context, Dunn's and Baker's testimony regarding the video focused on gun ownership, and the detective's testimony focused on how he identified Baker as the shooter.

The prosecutor also briefly referenced the video twice in her closing argument, with one reference merely in passing. Baker did not object to either reference and does not raise the closing argument's impropriety on appeal. Baker has thus waived his right to raise an independent claim that the prosecutor made an improper propensity argument in closing. See *Gates v. State*, 298 Ga. 324, 328-329 (4) (781 SE2d 772) (2016). Moreover, when the trial court ruled on the admissibility of the video, it could not possibly have factored

the prosecutor's later closing argument into its evaluation of prejudice under Rule 403. While trial courts certainly must consider the danger of unfair prejudice inherent to the contested evidence, we should not fault the trial court for failing to predict that the State will turn around and openly and intentionally use that evidence for improper purposes. The trial court should be able to make rulings with the understanding that the State will later follow the rules of evidence. I still disagree with the majority opinion on how much *danger* of unfair prejudice the video presented. But I do not calculate in how the State's eventual and actual use of the video impacted the verdict. That is more appropriately—and more commonly—a part of the harmless-error analysis. See, e.g., *Morrell v. State*, 313 Ga. 247, 261-262 (2) (869 SE2d 447) (2022) (considering State's mentions of prior act evidence in closing arguments when assessing harmless error).

But by focusing on the State's closing argument in the unfair prejudice analysis, the majority opinion appears to conflate the question of unfair prejudice under Rule 403 with the question of

whether the video, in the context of the entire trial, was harmful or harmless. Perhaps we have not been so careful to maintain this division in our past decisions regarding Rule 403 prejudice. See, e.g., *Whited v. State*, 315 Ga. 598, 606 (3) (883 SE2d 342) (2023) (affirming trial court's admission of evidence under Rule 403, in part by explaining "it is noteworthy in considering the extent of any unfair prejudice that the State's opening and closing statements did not focus" on the evidence in question, but, in support, only citing cases doing the same in their *harmless-error analyses*). But we have always maintained that exclusion under Rule 403 is an "extraordinary remedy which should be used only sparingly . . . ." Id. at 605 (3) (citation and punctuation omitted). The initial admission or exclusion of the evidence itself, often done before the trial even begins, is its own consideration. Here, when the trial court made its ruling to admit the video, it was properly focused on the video itself—not what the State might argue in closing. See *Wilson*, 315 Ga. at 739 (8) (a) (explaining that the question is "what specifically about *this* video might cause unfair prejudice") (emphasis in

original).

I also disagree with the majority opinion's holding regarding the video's probative value. For example, I do not agree that the video's probative value to prove access to the guns was "trivial." Majority Op. at 444. The State offered no connection between Baker and guns other than the video. The video showed that Baker was familiar and comfortable with handguns, which was probative to a critical part of the State's case. Regarding the other permissible uses of the video, the majority opinion only notes other trial evidence, including Baker's testimony, that served a similar purpose as the video, potentially diminishing its probity. However, I do not agree that the video lost its probative value to the degree that the majority opinion holds. Accordingly, the danger of unfair prejudice did not *substantially outweigh* the video's probative value here. The video was more probative and less prejudicial than the majority opinion holds.

Like the Rule 403 standard, the test for harmless error is also difficult to meet, as we must determine "whether it is *highly*

*probable* that the error did not contribute to the verdict." *Jivens v. State*, 317 Ga. at 859, 863 (2) (896 SE2d 516) (2023) (citation and punctuation omitted; emphasis supplied). I do not condone the prosecutor's potential misuse of the video to make a propensity argument, but she did not make "it a focal point of the trial." Majority Op. at 448. Ultimately, this case involved 19 witnesses—including Baker himself and someone who actually saw the shooting—and the trial transcript spans over 800 pages. The video was played for a total of 99 seconds, and discussion of the video took up only a few minutes of the four-day trial—a trial, as I have explained, in which substantial evidence of Baker's guilt was presented to the jury. Further, testimony by Baker and Dunn put the video in a performative context and explained that it was made in memory of a family member lost to gun violence. This helped mitigate whatever harm the video may have caused.

The majority opinion's harmless error analysis is also incomplete because it fails to account for the fact that Baker elected to testify at his trial, and the jury did not find him credible. See

57

*United States v. Phyfier*, 842 Fed. Appx. 333, 338 (III) (11th Cir. 2021) (per curiam) (explaining that, in the harmless error context, "it is well established that when a defendant testifies in his own defense, the jury may disbelieve his testimony, conclude that the opposite of his testimony is true, and consider it as substantive evidence of his guilt"). See also *Fitts v. State*, 312 Ga. 134, 143 (3) n.9 (859 SE2d 79) (2021) ("If disbelieved by the jury, [defendant's] testimony denying her involvement in the crime could have served as direct evidence of the opposite proposition."). For example, the jury was entitled to find that, contrary to his trial testimony, Baker was *not* in the van at the time of the shooting, but instead remained with the man in the camouflage cap, and that Baker did have a gun that night and was involved in the shooting. Cf. Majority Op. at 438.

Thus, even if Rule 403 did merit exclusion, it is "highly probable" that the video's admission did not contribute to the verdict. See *Ash v. State*, 312 Ga. 771, 782-783 (2) (865 SE2d 150) (2021) (holding that, if the prosecutor improperly used a prior conviction to show defendant's propensity for violence, its admission

was harmless when "neither the prosecutor nor [defense] counsel devoted much attention to this evidence in closing arguments" and the other evidence against defendant was "strong"). Therefore, I respectfully dissent.

I am authorized to state that Chief Justice Boggs joins in this dissent.

Decided March 5, 2024.

Murder. Houston Superior Court. Before Judge Lumsden.

*Garland Samuel & Loeb, Donald F. Samuel; Hogue Hogue Fitzgerald & Griffin, James T. Griffin*, for appellant.

*William M. Kendall, District Attorney, Rodrigo L. Silva, Assistant District Attorney; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Ashleigh D. Headrick, Assistant Attorney General*, for appellee.